[Cite as *State v. West*, 2018-Ohio-640.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2017-07-091 |
| | : | O P I N I O N |
| - vs - | | 2/20/2018 |
| | : | |
| WILLIAM TROY WEST, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2015-03-0497

Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Rion, Rion & Rion, L.P.A., Inc., Jon Paul Rion, Jason D. Norwood, 130 West Second Street, Suite 2150, P.O. Box 10126, Dayton, Ohio 45402, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1}  Defendant-appellant, William Troy West appeals from his convictions and sentence in the Butler County Court of Common Pleas for the sale of an unregistered security and the fraudulent act or practice in the sale of securities.  For the reasons set forth below, we affirm West's convictions and sentence.

{¶ 2}  On May 7, 2015, West pled guilty to a bill of information that charged him with

one count of the sale of an unregistered security in violation of R.C. 1707.44(C)(1) and one count of fraudulent acts or practices in the sale of securities in violation of R.C. 1707.44(G), both felonies of the second degree. The charges arose out of business dealings relating to a Texas company, North Shore Energy, LLC, that West and co-defendant, Catherine Schaper, were partners in. Between December 1, 2010 and September 10, 2011, West and Schaper sold unregistered promissory notes totaling more than $2.2 million to 18 investors to raise money for North Shore Energy to drill oil wells in Texas.[1] Sixteen of the sales took place in Butler County, Ohio.[2] Many of the investors were introduced to West, Schaper, and North Shore Energy through co-defendant Robert McManus. McManus hosted a radio show entitled "Safe Money America" where he pitched investments to listeners.

{¶ 3} When selling the promissory notes to investors, West and Schaper failed to disclose the material fact that, at the time of the sales, North Shore Energy was engaged in litigation in Texas regarding its leasing rights to the land that it was purporting to prepare to drill the oil wells on. After two wells North Shore Energy drilled on were found to be "dry" and North Shore Energy lost its lawsuit in Texas, the company was unable to pay back money to the investors.

{¶ 4} An investigation into West's, Schaper's, and North Shore Energy's activities was conducted, and each defendant faced 36 felony charges relating to the 18 sales of the promissory notes.[3] West, Schaper, and North Shore, represented by the same defense

---

1. Under Ohio law, the sale of promissory notes constitutes the sale of securities. *See* R.C. 1707.01(B). As the promissory notes sold by West and Schaper on behalf of North Shore Energy, LLC were not registered in Ohio, the acts constituted the sale of unregistered securities in violation of R.C. 1707.44(C)(1).

2. Although two of the sales took place outside of Butler County, Ohio (with one taking place in Indiana and the other in Kentucky), West, Schaper, and North Shore Energy agreed that the losses of the out-of-state victims would be covered by the restitution ordered pursuant to the plea agreement. West, Schaper, and North Shore Energy all also agreed to waive any jurisdictional defenses against the victims from Indiana and Kentucky.

3. Criminal charges were brought against West and Schaper individually and against their company, North Shore Energy, LLC. As managing partner of the company, Schaper entered a guilty plea on behalf of North Shore Energy. Criminal charges were also brought against McManus. He entered a guilty plea to one count of

attorney, entered into a plea agreement with the state. Each defendant agreed to plead guilty to one count of the sale of an unregistered security and one count of fraudulent acts or practices in the sale of securities in exchange for the state's agreement not to pursue the remaining charges. The defendants executed written plea agreements. The plea agreement executed by West provided as follows:

> *Defendant will waive restitution limitation and agree to $2,251,712.26 in restitution* to be divided as determined by the State among 18 victims to be specified, less any amounts that have been paid back to any of the 18 victims as will be provided by the State. All restitution is to be raised through fully legal means and in compliance with all federal, state and local laws. The defendants agree that any effort to raise restitution through illegal means will result in motion to the court to immediately set the matter for disposition.

> *The State and defendants agree that disposition will be delayed as may be recommended by the State or otherwise ordered by the court for the purpose of allowing defendants to continue legitimate efforts to raise restitution.* Defendants agree to cooperate with the State by providing regular communications regarding efforts to raise restitution. Sentencing will be delayed at least until the trial court concludes proceedings on remand in the case of North Shore Energy LLC vs. John James Harkin et al, Goliad County Texas, case no. 10-08-9635CV and thereafter at the discretion of the State and the court.

> The parties agree that the plea agreement shall be under seal of the court until final disposition of the case and that no press releases shall be issued pending unsealing [of] the case. Notwithstanding the sealing of the record, the State shall be allowed to communicate confidentially with the victims in the case for purposes of apprising them of case status and progress.

> *Upon payment of full restitution as provided herein, the State agrees to allow the defendants to withdraw all pleas in exchange for misdemeanor pleas to be further defined at that time.*

(Emphasis added.)

{¶ 5} Prior to accepting the defendants' guilty pleas, the trial court conducted a

---

selling securities without a license and one count of the sale of an unregistered security, both felonies of the second degree, at a separate hearing in Butler County Court of Common Pleas Case No. CR2014-10-1598.

Crim.R. 11(C) colloquy and advised the defendants of the rights they were waiving. West and Schaper were advised that each of the second-degree felonies for which they intended to plead guilty carried a presumption of a prison term, that the prison term for each second-degree felony offense was between two and eight years, and that the maximum possible prison term was 16 years as the court could run the sentences consecutively. The defendants indicated they understood the rights they were waiving and the possible penalties they faced and stated that no promises, other than those set forth in their respective written plea agreements, had been made to induce their guilty pleas. West and Schaper further informed the court that they had discussed the plea agreements with their attorney and were "satisfied with the efforts of [their] attorney."

{¶ 6} The court accepted North Shore Energy's, Schaper's, and West's pleas to the charges, noted that sentencing would be held in abeyance pursuant to the terms of the plea agreements, and sealed the proceedings to avoid any detriment to West's and Schaper's prospects for earning money to pay the agreed upon restitution. West and Schaper were released on their own recognizance and permitted to return to Texas.

{¶ 7} In December 2016, the state provided notice that court proceedings in the Texas case had concluded, and it sought to unseal the proceedings against West, Schaper, and North Shore Energy and move forward with sentencing. The trial court scheduled a sentencing hearing for March 28, 2017. Defense counsel, on behalf of West, Schaper, and North Shore Energy, moved to continue sentencing to a later date as there had not been a final entry journalized in the Texas case and Schaper had been diagnosed with a serious medical condition that required immediate treatment. The court rescheduled sentencing for June 5, 2017. Defense counsel again moved to continue sentencing to a later date as Schaper was undergoing treatment for her medical condition and was under doctor's orders not to travel. Defense counsel argued it was in the interest of judicial economy to continue

sentencing for all defendants "to avoid the inconvenience to the State and victims of having to travel to and prepare for two separate sentencing hearings." The trial court granted the continuance with respect to Schaper, but denied defense counsel's motion to continue sentencing for West and North Shore Energy.

{¶ 8} On June 1, 2017, just four days prior to the sentencing hearing, defense counsel again moved to continue sentencing. Counsel argued that the defendants were seeking to "raise restitution through the ongoing activities of Challenger Water Solutions Company, which provides wastewater treatment services to the oil and gas drilling industry [and it was] * * * anticipated that this enterprise [would] generate substantial revenues to pay restitution in full or a major part thereof no later than July 1, 2017." Attached to defense counsel's motion for a continuance was a copy of a $54,500 check, dated June 1, 2017, that the defendants had submitted as partial restitution. Defense counsel indicated that the funds "represent[ed] income received from the operations of Challenger, which [is] now generating revenue, and expected to allow Defendants to continue to pay a minimum of $7,500 per month in restitution for the foreseeable future, with a probability of greater amounts, depending on the speed of that business's growth."

{¶ 9} The trial court denied the June 1, 2017 motion for a continuance. On June 5, 2017, West and North Shore Energy appeared before the court for sentencing with their shared defense counsel. McManus, represented by separate counsel, also appeared before the court for sentencing at this time.

{¶ 10} West's defense counsel asked the court to impose community control sanctions on West, rather than a prison term, as West had "no prior criminal involvement at his age [of] 50" and the presentence investigation report ("PSI") indicated West was unlikely to reoffend. Defense counsel stated West was determined to repay the investors, had recently submitted $54,500 in restitution, and was working diligently to make his new

business, Challenger Water Solutions, a success so that he could pay the remaining restitution. Defense counsel noted he had "review[ed] the timeline of this case and there's not a single reason to believe that at any point when this was unfolding that Mr. West had an intent not to repay his investors," and he pointed out that numerous letters had been sent to the court attesting to West's good character.

{¶ 11} Defense counsel then invited West's mother, father, stepmother, girlfriend, and business partner in Challenger Water Solutions to speak on West's behalf. West's mother stated she was not sure whether West "had full knowledge of what went on here," or whether he was actually "involved in speaking to any of [the] victims," but she believed West had not intended to hurt anyone and was "willing to work very hard with his partner to repay" the investors. West's father stated his son was "probably guilty of a lack of due diligence and really the due diligence was given to his business partner at the time [Schaper] and he was unaware of the laws in the State of Ohio." West's father opined that West would "never knowingly defraud anyone" and his "only motivation at this point is to see that all of these investors are repaid in full." West's stepmother agreed with West's father's opinion, stating that it was "never [West's] intent to hurt any of the investors [or] to not be able to give them their money in full plus more."

{¶ 12} West's girlfriend stated that "[t]here's nothing more that [West] wants than to see that all of [the investors] get paid back * * * so that everybody can move on with their lives." She claimed West had created a new business "for the sole purpose of getting everyone paid back," that Schaper had nothing to do with the new business, and that the $54,500 that had been paid in restitution "came from Mr. West's efforts alone." West's new business partner, Clint Layman, stated he and West had been working for the last two years to make Challenger Water Solutions profitable so that West could repay the investors. Layman indicated West had been upfront with him when Challenger Water Solutions was

formed, telling him that he would likely have to forgo the profits from the business so that the investors in North Shore Energy could be repaid. Layman claimed that with a little more time, the business would be profitable and full restitution could be made.

{¶ 13} West exercised his right of allocution, stating that he always intended to pay the investors back but the loss of the Texas case, which resulted in the reversal of a multimillion dollar judgment, and the drilling of dry oil wells in Texas had impeded his ability to do so. West claimed that neither he nor Schaper were aware that selling unregistered promissory notes was illegal in Ohio, as such actions were lawful in Texas. With respect to how North Shore Energy operated, he explained that Schaper "did all the paperwork; filing commission stuff; investment paperwork. I did all the operations and honestly raised the majority of the money, but that was out of Texas. Up here, the majority of the money was raised * * * by Cathy [Schaper] and Mr. McManus." He contended Schaper was the one that had the business relationship with McManus, she was the "front person that spoke with all [the investors] all the time," and when he "asked Cathy [Schaper] if she had checked to make sure everything was kosher up here [in Ohio] * * * she told [him] 'yes' and [he] trusted her."

{¶ 14} West discussed the fact that he anticipated he would be able to make additional restitution payments to the investors by earning money through his new business. West anticipated that he would earn "a minimum of $50,000" through Challenger Water Solutions over the next five months and that "[t]here would be a lot of financial gains in the next two to three years with this company."

{¶ 15} McManus then addressed the court and stated that he had been defrauded by Schaper and West. Despite having been licensed to sell securities in Ohio in the past, McManus claimed he was unaware that promissory notes were treated as securities in Ohio. He further claimed that when he advised the investors that investing in North Shore Energy was a wise decision, he had been unaware that the company was involved in litigation in

- 7 -

Texas. He stated that he did not know when Schaper and West "decided to scam, but they tricked me and have crushed my business, my family, and hurt by clients."

{¶ 16} Two of the victim-investors spoke on behalf of McManus. R.F, and M.F., a married couple, indicated they had lost nearly $300,000 in their business dealings with West, Schaper, North Shore Energy, and McManus. However, R.F. felt "McManus is guiltless in all of this [as] * * * he [n]ever intended to defraud anyone, to cause harm to any of the investors that he dealt with under any circumstances." R.F. opined that sending McManus to jail "would be a monumental waste of time." Although R.F. claimed that he dealt "mainly" with Schaper in the purchase of the promissory notes, M.F. stated "[a]ll three of them [McManus, West, and Schaper] were in our house telling us about the money."

{¶ 17} The state spoke of the financial devastation the investors experienced as a result of West's, Schaper's, McManus', and North Shore Energy's actions. The state noted that an 80-year-old investor lost more than $350,000, or 80 percent of his life savings, in his dealings with the defendants. Another investor lost two-thirds of his life savings and a third investor lost $250,000. The state argued that West's and McManus' actions were "extremely serious because of the devastation and the impact that they ha[d] upon people's lives" and noted that in the two years that passed since the defendants entered their guilty pleas, the defendants had failed to provide any updates as to their restitution efforts and the only restitution that had been received was the $54,500 that was submitted on June 1, 2017. The state contended that the imposition of prison terms on McManus and West was necessary to serve as a deterrent effect and to serve the interests of justice.

{¶ 18} Multiple investors spoke at the sentencing hearing, detailing the hardships they and their family members have faced as a result of the defendants' unlawful and fraudulent dealings. Two of the investors expressed the opinion that sentencing McManus and West to prison would not help them or any of the other victims in getting their money back.

{¶ 19} After considering the information presented at the sentencing hearing, as well as the PSI, letters submitted to the court, and victim-impact statements, the court imposed a $30,000 fine on North Shore Energy. The court found, with respect to McManus and West, that the presumption of a prison term had not been overcome due to the seriousness of their crimes. After noting that McManus failed to exercise due diligence and used his relationship with the investors to facilitate his crimes, the court imposed concurrent five-year prison terms on his convictions for selling securities without a license and the sale of an unregistered security. The court found West had a "slightly increased level of culpability" as a result of his fraudulent conduct in failing to disclose to the investors North Shore Energy's ongoing litigation in Texas, and the court sentenced him to concurrent six-year prison terms for selling an unregistered security and for the fraudulent act or practice in the sale of securities. All three defendants were ordered to pay restitution to the victims, jointly and severally, in the amount of $1,942,239.79.

{¶ 20} West timely appealed, raising two assignments of error.

{¶ 21} Assignment of Error No. 1:

{¶ 22} APPELLANT'S TRIAL COUNSEL'S JOINT REPRESENTATION OF APPELLANT AND [A] CO-DEFENDANT CREATED A CONFLICT OF INTEREST THAT ADVERSELY AFFECTED TRIAL COUNSEL'S PERFORMANCE.

{¶ 23} In his first assignment of error, West argues he was adversely affected at sentencing by his defense counsel's joint representation of Schaper and North Shore Energy as the joint representation foreclosed defense counsel from making the argument that West was less culpable than Schaper.[4] West sets forth a number of things he believes defense

4. In his appellate brief, West focuses his arguments on the sentencing proceeding, stating his "trial attorney also represented his co-defendants Catherine Schaper and North Shore Energy throughout this criminal case. *During sentencing*, this joint representation affected trial counsel's performance on behalf of [West]." (Emphasis added.) In his reply brief, West attempts to raise concerns relating to his defense counsel's representation during the plea proceedings, stating, "although there is scant record evidence as to the extent of plea

- 9 -

counsel was precluded from doing due to his joint representation, including (1) probing Schaper's official role with North Shore Energy to establish her extensive presence in Ohio as compared to West's own presence; (2) cross-examining McManus and the victims who spoke at sentencing to establish Schaper's relationship with McManus and her "constant presence and leadership in Ohio, to the exclusion of [West]"; and (3) pointing out that Schaper had not paid any restitution in the two years since she entered her guilty plea, whereas West had started a new company and paid back more than $50,000.

{¶ 24} "Where there is a right to counsel, the Sixth Amendment to the United States Constitution also guarantees that representation will be free from conflicts of interests." *State v. Dillon*, 74 Ohio St.3d 166, 167 (1995). "Joint representation is suspect because a possible conflict of interest is inherent in it." *State v. Mohrman*, 9th Dist. Lorain No. 02CA008053, 2002-Ohio-6610, ¶ 9, citing *Dillon* at 168. However, as the Ohio Supreme Court has recognized, "[a] trial court is not constitutionally mandated to inquire of criminal co-defendants whether they wish to be jointly represented by the same counsel." *State v. Manross*, 40 Ohio St.3d 180 (1988), syllabus. While the "better practice" is for a court to make a prompt inquiry and advise each defendant of the right to effective assistance of counsel, including separate representation, the court is not constitutionally required to make this inquiry. *Id.* Absent special circumstances, it is "reasonable for the trial court to assume that multiple representation entails no conflict or that the lawyer and his clients knowingly accepted such risk of conflict as may be inherent in such representation." *Id.* at 182, citing

---

negotiations, *there also exists a possibility* that the conflict in the case was not restricted to [West's] attorney's performance at the sentencing hearing." (Emphasis added.) As it is a well-established rule that an appellant may not raise new arguments or issues in his reply brief, we find we need not address West's arguments as they relate to his counsel's representation during the plea proceedings. *See State v. Renfro*, 12th Dist. Butler No. CA2011-07-142, 2012-Ohio-2848, ¶ 28. We note, however, that a defendant's constitutional rights under the Sixth Amendment are violated by an actual conflict of interest in joint representation, not the mere possibility of one. *State v. Gillard*, 78 Ohio St.3d 548, 552 (1997), citing *Cuyler v. Sullivan*, 446 U.S. 335, 348-350, 100 S.Ct. 1708 (1980).

- 10 -

*Cuyler v. Sullivan*, 446 U.S. 335, 346-347, 100 S.Ct. 1708 (1980).

**{¶ 25}** A court's judgment will, however, be reversed "if an appealing defendant shows that an *actual conflict* adversely affected counsel's representation of said defendant." (Emphasis added.) *Id.* at syllabus. An actual conflict of interest exits, if, "'during the course of the representation, the defendants' interests *do* diverge with respect to a material factual or legal issue or to a course of action.'" (Emphasis sic.) *State v. Gillard*, 78 Ohio St.3d 548, 553 (1997), quoting *Dillion* at 169. Or, stated another way, an attorney represents conflicting interests "when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *Manross* at 182.

**{¶ 26}** "In order to establish a Sixth Amendment violation due to a conflict of interest, a defendant who failed to object at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Gillard* at 552, citing *Cuyler* at 348. When a defendant argues – like West has done here – that there was an actual conflict of interest based on his attorney's failure to do something or to pursue a specific course of action, that defendant must demonstrate two elements. *Id.* at 553. First, the defendant must show that "'some plausible alternative defense strategy or tactic might have been pursued.'" *Id.*, quoting *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir.1985). Although the defendant need not demonstrate the alternative defense would necessarily have been successful if used, he must show that it possessed "sufficient substance to be a viable alternative." *Id.* Second, the defendant must "'establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *Id.*, quoting *Fahey* at 836.

**{¶ 27}** At sentencing, defense counsel's strategy was to demonstrate that the presumption of a prison term for a second-degree felony had been overcome and that West had accepted responsibility for his wrongdoing, was remorseful for his actions, and was

eager and willing to repay the victims by raising funds through his new business venture. Defense counsel argued that throughout the "timeline of this case," West had maintained his intention to repay the money the victims had invested in North Shore Energy, and counsel presented five mitigation witnesses who all spoke to this effect.

{¶ 28} West now argues a second plausible defense strategy existed – that he was less culpable than Schaper for the wrongdoing – and that defense counsel did not pursue this alternative strategy because of his legal obligations to Schaper. After thoroughly reviewing the record, we find that this was not a viable alternative strategy and that counsel's decision not to argue Schaper was the "real party responsible" for the criminal wrongdoing was not due to counsel's obligations to Schaper. Rather, the relative culpability argument was contradicted by the record. By pleading guilty, West admitted to engaging in fraud when selling the promissory notes to the investors. Specifically, West pled guilty after the state's recitation of the following facts:

> [W]ith regard to those counts, Your Honor, they pertain to the same 18 sales of securities in the State of Ohio with the additional element of fraud * * * involved in these counts, by virtue of the fact that the Defendants failed to disclose to the purchasers of those securities a – the fact that this corporation was already in litigation at the time of these sales, prior to the sale of the first security, and the litigation involved their rights to the lease, that the – of the well, that they were purporting to prepare to drill, and that fact, constituting a very material fact, in a person's decision of whether or not they might wish to invest in this thing, was omitted from disclosure in any fashion to any of the investors, and thus constituting the act of fraudulent practices, or fraudulent acts in the sale of securities.

{¶ 29} Additionally, statements made by the victims at sentencing demonstrated West had contact with the investors in Ohio and was also culpable for the crimes committed against them. As one investor noted about McManus, Schaper, *and West*, "[t]hrough this whole deal, *these three people* have conned us [at] people's houses." (Emphasis added.) Another investor commented "*[a]ll three of them* were in our house telling us about the

money." (Emphasis added.)

{¶ 30} West claims that defense counsel should have questioned the investors and McManus at sentencing about their interactions and relationships with Schaper, as compared to their interactions with him, to establish his lesser culpability. However, when the investors gave their statements at sentencing they were not under oath and were not subject to cross-examination. Victims are provided with the right to make an oral statement at their perpetrator's sentencing hearing as a way of "assist[ing] the judge in sentencing [the] defendant" and providing "'[a]n explanation of the nature and extent of any physical, psychological, or emotional harm [they] suffered.'" *State v. Funderburg*, 2d Dist. Montgomery No. 20450, 2005-Ohio-2235, ¶ 13-14, quoting R.C. 2930.13(C)(1); *see also* Crim.R. 32(A)(3). Neither the due process clause nor the confrontation clause "extend[s] to a right to cross-examine a * * * [victim] regarding his [or her] victim impact statement." *Id.* at ¶ 12. *See also State v. Spears*, 2d Dist. Montgomery No. 14869, 1995 Ohio App. LEXIS 4574, *12-13 (Oct. 18, 1995) (noting that a defendant who has pled guilty has "surrendered his right to confront his accuser and to cross-examine him on the charge and specification. [At sentencing,] [t]he victim [is] merely given the same statutory right to make an unsworn statement, not subject to cross examination, that [is] accorded to [the defendant] by virtue of the statutory right of allocution"). Defense counsel, therefore, could not have questioned the victims on West's behalf to try to flush out his alleged lesser culpability. Similarly, as McManus was exercising his right of allocution when he spoke at the sentencing hearing, he was likewise not subject to cross-examination by West's counsel.

{¶ 31} Further, although West believes his counsel should have focused on his "lesser culpability" as a defense strategy at sentencing rather than addressing West's remorse, accountability, and desire to repay the investors, the record reflects that mitigation witnesses called on West's behalf did discuss his alleged lesser culpability. West's family

members, girlfriend, and new business partner stated West never intended to harm the victims and he was the only defendant who had made any efforts to repay the victims. These witnesses also called into question West's actions and knowledge of events, especially as compared to Schaper's. West's mother stated she doubted that West had "full knowledge of what went on here" or that West was "involved in speaking to any of [the] victims." West's father commented that West relied on and gave "due diligence" to Schaper as West was unaware of the laws in Ohio.

**{¶ 32}** The fact that defense counsel did not focus his argument at sentencing on Schaper's alleged greater culpability and wrongdoing is not indicative of an actual conflict of interest. As discussed above, the relative culpability defense was not a viable defense strategy and counsel's decision not to pursue it was not due to his obligations to Schaper. Defense counsel followed an effective defense strategy in focusing on West's remorse and accountability. *See Gillard*, 78 Ohio St.3d at 555 (noting that the discussion of trial counsel's strategy is relevant to whether an actual conflict adversely affected counsel's performance at trial). That counsel's defense strategy also benefited Schaper is not proof that a conflict of interest existed by counsel's joint representation. As the Ohio Supreme Court noted in *Gillard*, "[t]here is 'no conflict of interest adversely affecting the attorney's performance at trial if an attorney at trial does not raise a defense on behalf of his client because to do so is not in that client's interest even though it is also in the interest of another client that it not be raised. To the contrary, that is a coincidence of interests.'" *Id.* at 555, quoting *United States v. Gambino*, 864 F.2d 1064, 1071 (3d Cir.1988).

**{¶ 33}** Accordingly, for the reasons set forth above, we find there was not an actual conflict of interest in defense counsel's joint representation of Schaper, North Shore Energy, and West. West's arguments are without merit and his first assignment of error is overruled.

**{¶ 34}** Assignment of Error No. 2:

{¶ 35} THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO DUE PROCESS AND EQUAL PROTECTION WHEN IT IMPOSED A HARSHER SENTENCE BECAUSE HE WAS UNABLE TO PAY THE ENTIRE RESTITUTION AMOUNT PRIOR TO SENTENCING.

{¶ 36} In his second assignment of error, West contends the trial court violated his right to due process and equal protection when it sentenced him to concurrent six-year prison terms on his second-degree felony convictions due to his inability to pay the full $2.2 million in restitution to the victims prior to the sentencing hearing. West contends that because the prosecutor determined repayment of the $2.2 million in restitution was the "appropriate and adequate remedy" for West's crimes and was willing to plead West's crimes down to misdemeanor offenses if full restitution was made, the trial court "violated [West's] equal protection and due process rights * * * [by] imposing a stiffer sentence after financial losses rendered West unable to pay." He further argues "the trial court revealed its motivation in imposing such a lengthy sentence to a non-violent first-time offender" when it informed him at sentencing that payment of restitution over the next few years would influence it to grant a motion for early judicial release. In support of his arguments, West relies on *Bearden v. Georgia*, 461 U.S. 660, 103 S.Ct. 2064 (1983).

{¶ 37} "[C]onstitutional guaranties of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons. Both equal protection and due process emphasize the aim of our entire judicial system – all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" *Griffin v. Illinois*, 351 U.S. 12, 17, 76 S.Ct. 585 (1956), quoting *Chambers v. Florida*, 309 U.S. 227, 241, 60 S.Ct. 472 (1940). To this end, the United States Supreme Court has held that "the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants

- 15 -

irrespective of their economic status." *Williams v. Illinois*, 399 U.S. 235, 244, 90 S.Ct. 2018 (1970). Therefore, "a State may not constitutionally imprison beyond the maximum duration fixed by statute a defendant who is financially unable to pay a fine." *Id.* at 243. Further, "the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." *Tate v. Short*, 401 U.S. 395, 398, 91 S.Ct. 668 (1971).

{¶ 38} In *Bearden*, the case relied upon by West, a defendant pled guilty to burglary and theft by receiving stolen property. *Bearden*, 461 U.S. at 662. He was sentenced to three years on probation and, as a condition of probation, ordered to pay a $500 fine and $250 in restitution within four months of the sentence being imposed. *Id.* After the defendant failed to pay the full balance, the state moved to revoke his probation. *Id.* at 663. The trial court revoked the defendant's probation, entered a conviction, and sentenced the defendant to serve the remaining portion of the probationary period in prison. *Id.* The case made its way to the United States Supreme Court, which was asked to determine "whether the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution." *Id.* at 661. The Court answered this question in the affirmative, finding that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." *Id.* at 667-668. The Court, therefore, held that "in revocation proceedings for failure to pay a fine or restitution, a sentencing court must inquire into the reasons for the failure to pay. If the probationer willfully refused to pay or failed to make sufficient bona fide efforts legally to acquire the resources to pay, the court may revoke probation and sentence the defendant to imprisonment within the authorized range of its sentencing authority." *Id.* at 672.

{¶ 39} We find *Bearden* inapplicable to the case at hand. As this court has previously

stated, "[t]he Supreme Court's decision in *Bearden* * * * is limited and 'stands only for the proposition that the court cannot *imprison* a probationer for failure to make required payments unless the probationer failed to make bona fide efforts to pay and alternatives to imprisonment are inadequate in a particular situation.'" (Emphasis sic.) *State v. Pickett*, 12th Dist. Warren No. CA2014-09-115, 2015-Ohio-972, ¶ 19, quoting *State v. Bell*, 264 Ore.App. 230, 233, 331 P.3d 1062 (2014).

**{¶ 40}** Unlike the defendant in *Bearden*, West was not a probationer being sentenced to a prison term for his failure to pay previously ordered restitution. Rather, West was a defendant facing sentencing for the first time after entering a guilty plea to two second-degree felonies. Prior to June 5, 2017, the court had not imposed a sentence on West and had not ordered restitution. When West appeared before the court on that date, the court was required to impose a sentence in compliance with Chapter 2929 of the Revised Code. R.C. 2929.13(D)(1) provides a presumption in favor of a prison term for a second-degree felony offense, and R.C. 2929.14(A)(2) specifies that the adequate remedy for such an offense is a prison term of "two, three, four, five, six, seven, or eight years." Therefore, when the court imposed a six-year prison term on West after considering the principles and purposes of sentencing and the seriousness and recidivism factors set forth in R.C. 2929.11 and 2929.12, the court was not penalizing West for not having the funds to repay his victims. When West appeared before the court on June 5, 2017, he was in the same position, facing the same potential sentence, that he had been in when he initially entered his guilty plea in May 2015.[5] The statutory ceiling placed on imprisonment for West's offenses was the same

---

5. We note that the trial court advised West at the plea hearing that there was a presumption in favor of a prison term for second-degree felony offenses and that the court could sentence him to prison for 16 years if the court imposed maximum consecutive sentences. It was not a condition of West's plea, and the trial court never indicated, that the failure to pay the $2.2. million in restitution before the plea hearing would result in a prison term.

for any defendant convicted of a second-degree felony, regardless of the defendant's economic status. *See Williams*, 399 U.S. at 244.

{¶ 41} Relying on *Bearden,* 461 U.S. at 667-668, and the state's willingness to allow him to withdraw his guilty plea and plead to a misdemeanor offense if the agreed upon $2.2 million was repaid to the victims prior to sentencing, West further contends that the state "determined that restitution was the appropriate and adequate remedy" for his crimes and that he could not be imprisoned because he lost the Texas lawsuit and was therefore unable to pay the agreed upon sum. However, *Bearden* is again distinguishable as it did not involve a plea agreement that was carefully bargained for and was knowingly, intelligently, and voluntarily entered by the defendant. Courts that have considered arguments similar to the one posited by West have concluded that a defendant's constitutional rights to due process and equal protection are not implicated when a defendant willingly bargains for a better sentence in the event he makes restitution. *See, e.g., United States v. Johnson*, 767 F.Supp. 243 (N.D.Ala.1991); *State v. Lambert*, 2d Dist. Clark No. 2015-CA-5, 2015-Ohio-5168.

{¶ 42} In *Lambert*, a defendant entered into a plea agreement to one count of theft in exchange for a six-month prison term being run concurrently to a previously imposed prison term on the condition that the defendant pay $2,425 in restitution prior to the sentencing hearing commencing in three months. *Lambert* at ¶ 4-5. Pursuant to the terms of the plea agreement, if the defendant was unable to pay the agreed upon restitution by the three-month deadline, the court would then run the six-month sentence consecutively to the previously imposed sentence. *Id.* at ¶ 5. The defendant failed to pay the agreed upon restitution order, and at sentencing was sentenced to a consecutive six-month prison term. *Id.* at ¶ 6. He appealed, arguing his constitutional right to equal protection was violated because his economic status impacted the sentence he received, i.e., had he been able to pay the agreed upon restitution, he would have received a more favorable concurrent

sentence. *Id.* at ¶ 22-23. The Second District Court of Appeals found that the defendant's constitutional challenge was barred under the doctrine of invited error, as he bargained for and agreed to the terms of the plea agreement. *Id.* at ¶ 28.

**{¶ 43}** We agree with the Second District's position. "Under the invited-error doctrine, a party is not entitled to take advantage of an error that he himself invited or induced the trial court to make." (Emphasis omitted.) *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, ¶ 243, citing *State ex rel. Kline v. Carroll*, 96 Ohio St.3d 404, 2002-Ohio-4849, ¶ 27. "The doctrine applies to cases in which a defendant entered into a plea agreement covering the alleged error claimed on appeal." *Lambert* at ¶ 28, citing *State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, ¶ 10 (holding a defendant cannot take advantage of an error that he invited through the plea negotiations); *State v. Marcum*, 4th Dist. Hocking Nos. 12CA22 and 12CA26, 2013-Ohio-2189, ¶ 10 (the invited error doctrine "applies to errors arising from a negotiated plea agreement"). Here, West willingly bargained for a better sentence in the event he was able to repay the investors prior to imposition of his sentence. Under the invited error doctrine, he cannot now claim a constitutional violation due to the fact that he was unsuccessful in his goal.

**{¶ 44}** West also argues the trial court erred in imposing his sentence as the court indicated it would consider shortening his sentence by granting judicial release if restitution was paid to the victims. In support of this argument, West relies on *Noel v. State*, 191 So.3d 370 (Fla.2016). In *Noel*, a defendant was convicted following a jury trial of grand theft and conspiracy to commit racketeering. *Id.* The trial court imposed a sentence that provided that if the defendant made a $20,000 restitution payment within 60 days of the sentence being announced, the court would reduce the defendant's sentence from 10 years to eight years. *Id.* at 372-373. After the defendant failed to pay this amount within 60 days, he appealed his sentence on the basis that it violated his constitutional rights. *Id.* at 373. The Florida

Supreme Court concluded the defendant's due process rights were violated because "the length of [his] prison sentence was expressly conditioned on whether or not [he] paid the sum within sixty days." *Id.* at 379. As the "nonpayment of restitution yielded an increase of two years' incarceration to [the defendant's] sentence * * * solely because of his lack of financial resources," the court concluded the defendant was deprived of the fundamental fairness required by the Fourteenth Amendment. *Id.* at 379.

{¶ 45} We find West's reliance on *Noel* misplaced. Unlike the defendant in *Noel*, the trial court did not impose a conditional sentence on West. Rather, the court imposed an unequivocal six-year prison term on West. The trial court did mention a possible shorter sentence for West, but this was in reference to a motion for judicial release. The record reveals that immediately after the court imposed West's six-year sentence, his counsel moved to stay the sentence for "as long as [West] can continue to make substantial period restitution payments." The court denied this request, but stated payment of restitution would be a consideration if West later moved for judicial release. Specifically, the court stated the following:

> THE COURT: I am denying the request for Mr. West * * * to stay the execution of his sentence today.
>
> I would throw this out and I – for the Defendant's purposes, I almost never grant motions for judicial release. Twenty years ago the sentencing statutes were changed and one of the goals of that was that – seems to me as what was stated by the legislature – that people should expect when they hear a judge state a sentence that's what it is. People used to talk about shock parole and things like that and I've not been a big fan of that and I've accepted that limitation by the State legislature pretty willingly.
>
> So when I impose six years * * * I mean, almost always that's exactly what it's going to be. I will not grant motions for early judicial release. I wouldn't want to give a favor to Mr. West necessarily just because he has the – perhaps has the wherewithal whereas Mr. McManus perhaps doesn't, but certainly, if his ownership interests in the water purification

- 20 -

company – if that is as lucrative as he sees it being, and if it does maybe within a year or two get the contract with Cargill, you get a contract with whoever else, and the money just rolls in hand over fist, and we've got $1.9 million in here in a year or two, or whatever, if I – that might – I've never had a factor like that – assessing a motion for judicial release, but you, I'm just throwing that out there to say that there might be, even in prison, there might be some motivation.

I say this for the victims mostly to give them some hope and then to * * * maybe * * * put a carrot out there in front of Mr. West not to just say "oh, psst, I'm done with this. I mean I'm going to prison so psst, you know those people in Ohio they can just, you know stuff it." I mean, if there is still ownership interest – if there is that great desire that's been expressed to pay * * * if that's happening in the next few years, and if I got a motion for early judicial release, that would be very – it would influence me probably more than most things influence me when I address those motions, but that would be based upon the idea that it would be remiss I think with a six-year sentence though – I think at the earliest might be five years, even. So that's not much of a carrot.

{¶ 46} Thus, while the court indicated payment of court-ordered restitution would be a consideration in the future if a motion for judicial release was filed, the court did not impose a sentence on West that conditioned the duration of the prison term on whether he was able to pay restitution. *Noel*, therefore, does not apply.

{¶ 47} Accordingly, for the reasons stated above, we find no merit to West's arguments and conclude that the trial court did not violate West's right to due process or equal protection when it imposed a six-year prison term. West's second assignment of error is, therefore, overruled.

{¶ 48} Judgment affirmed.

S. POWELL, J., concurs.

RINGLAND, J., concurs separately.

**RINGLAND, J., concurring separately.**

- 21 -

**{¶ 49}** I agree with the majority that the first assignment of error should be overruled. West failed to show that an actual conflict of interest existed in this case. However, I continue to urge caution in circumstances involving joint representation. *See State v. McClure*, 12th Dist. Clermont No. CA2015-06-045, 2015-Ohio-5203, ¶ 31-39 (Ringland, J., dissenting). The "better practice" in these circumstances is for a trial court to make prompt inquiry and advise each defendant of his constitutionally protected rights. However, because West failed to show an actual conflict of interest, I agree with the majority's ultimate resolution of the first assignment of error.