21CA1975 Peo v O'Brien 11-27-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA1975
Boulder County District Court No. 19CR234
Honorable Norma A. Sierra, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

James O'Brien,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE HARRIS
J. Jones and Gomez, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 27, 2024

Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Walta LLC, Mark G. Walta, Littleton, Colorado, for Defendant-Appellant

¶ 1    Defendant, James O'Brien, appeals the judgment of conviction entered after a jury found him guilty of manslaughter. He contends that he was denied the effective assistance of counsel due to his lawyers' conflict of interest and that the trial court erred by allowing lay witnesses to give expert testimony. We affirm.

## I.    Background

¶ 2    On the night of the incident giving rise to the charges, the victim, Demetrius Shankling, was celebrating his twenty-third birthday with college friends in Boulder. By the time the celebration ended, Shankling was highly intoxicated and needed some physical support from his friends to walk. About a block away from the friends' apartment, Boulder police officers contacted the group and decided to transport Shankling to a detox facility.

¶ 3    O'Brien and Adam Lunn, then deputies with the Boulder County Sheriff's Office (BCSO), responded to the scene with a transport van. The van had three compartments — two accessible from the rear of the van (a long compartment on the left side and a shorter compartment on the right side) and one small seating cell accessible from the side, located right behind the front passenger seat, as depicted in the diagram below.



Transport Van Diagram

¶ 4    When Shankling refused to step into the van, O'Brien and Lunn picked him up and wedged him face down, with his hands cuffed behind his back, onto the floor of the right rear compartment.  Shankling was six feet tall.  The compartment was four feet nine inches long and eighteen inches wide.  The officers' positioning of Shankling's body forced his legs and head upward, causing his neck to compress, which restricted his oxygen supply and ultimately cut off blood flow to his brain.

¶ 5    Sixteen minutes later, the van arrived at the detox facility. Shankling was limp and unresponsive.  He died about a month later, without having regained consciousness.  According to the medical examiner who conducted the autopsy, the cause of death was positional asphyxiation, complicated by the effects of alcohol and amphetamines.

¶ 6    The People charged O'Brien and Lunn separately with one count of manslaughter. Their cases were later joined for trial. From the beginning, they were jointly represented.

¶ 7    The jury found both defendants guilty as charged. The court sentenced O'Brien to a six-year prison term and Lunn to a three-year term.

## II.    Ineffective Assistance of Counsel

¶ 8    O'Brien contends that he received ineffective assistance of counsel because his lawyers had an actual conflict that he did not validly waive.

### A.    Facts

¶ 9    O'Brien and Lunn were jointly represented by two lawyers from the same firm. About eight months into the case, at the prosecution's request, the court conducted a hearing to determine whether the defendants wished to waive their right to conflict-free counsel.

¶ 10    At the hearing, defense counsel told the court that although she did not perceive any conflict or "anticipate any arising," the lawyers had advised O'Brien about any potential conflicts. The

court did not ask, and counsel did not offer, any specifics about counsel's advisement.

¶ 11 For its part, the court told the defendants that they had "the right to conflict-free counsel," meaning the right to "have separate counsel" represent each of them at trial. The court cautioned that if at some point the defendants' interests "bec[a]me adverse," they "m[ight] not have independent representation at that point." The court explained that O'Brien's "interests m[ight] be affected by the defense that [was] being raised on behalf of" Lunn and that the defense strategy "could impact [one defendant's] rights versus [the other defendant's] rights." O'Brien confirmed that he did not know "of any claim that [Lunn] ha[d] raised that would impact [his] right to a fair trial." O'Brien did not consult with independent counsel but said he had spoken to his lawyers about how the joint representation "might impact [him]," and he did not have any questions about the issue.

¶ 12 The court found that O'Brien waived his right to conflict-free counsel knowingly, intelligently, and voluntarily.

¶ 13 At trial, O'Brien and Lunn advanced a coordinated defense. Through counsel, they argued that Shankling might have died of

alcohol poisoning, not positional asphyxia; Shankling's placement in the van could not cause positional asphyxia in any event; and, even if it could, the defendants were unaware of the risk due to inadequate training.

## B. Legal Principles

¶ 14 A criminal defendant has a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). This right encompasses a right to conflict-free representation. *West v. People*, 2015 CO 5, ¶ 15.

¶ 15 When a defendant's ineffective assistance of counsel claim is premised on a conflict of interest, we assess the claim under the standard outlined in *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980), rather than *Strickland*. To prevail under this standard, the defendant must show that (1) counsel had a conflict of interest, meaning, as relevant here, they faced "a situation inherently conducive to and productive of divided loyalties," such as concurrent representation, *West*, ¶¶ 40, 42 (citation omitted); and

(2) the conflict adversely affected counsel's performance, *Sullivan*, 446 U.S. at 348.[1]

¶ 16   To prove an adverse effect, the defendant must

   (1)   identify a plausible alternative defense strategy or tactic that trial counsel could have pursued;

   (2)   show that the alternative strategy or tactic was objectively reasonable under the facts known to counsel at the time; and

   (3)   establish that counsel's failure to pursue the strategy or tactic was linked to the actual conflict.

*West*, ¶ 3. Once the defendant shows that a conflict of interest adversely affected his lawyer's performance, prejudice is presumed. *Sullivan*, 446 U.S. at 349-50.

¶ 17   A defendant may generally waive the right to conflict-free counsel. *People v. Villanueva*, 2016 COA 70, ¶ 43. But a waiver is valid only if the defendant is "fully advised of existing or potential

---

[1] In contrast, a defendant proves a non-conflict ineffective assistance of counsel claim by establishing that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

conflicts," and he understands the potential effect of any conflict on counsel's ability to provide effective representation. *People v. Martinez*, 869 P.2d 519, 525 (Colo. 1994). The record must show that the defendant's waiver of conflict-free counsel was voluntary, knowing, and intelligent. *Id.*

¶ 18    A valid waiver bars any later ineffective assistance of counsel claim based on a conflict. *Id.* at 524. However, the absence of a valid waiver does not, by itself, entitle the defendant to relief. *Villanueva*, ¶ 48. Instead, it merely allows the defendant to raise his ineffective assistance of counsel claim. In other words, the defendant must show that the "failure to validly waive the conflict mattered" because he ultimately proceeded to trial with a lawyer who had an actual conflict of interest. *Id.*

¶ 19    Ordinarily, a claim of ineffective assistance of counsel may not be raised on direct appeal because "there is usually an insufficient factual record for the appellate court to decide the issue." *People in Interest of Uwayezuk*, 2023 COA 69, ¶ 21. Likewise, a defendant's challenge to the knowing, voluntary, and intelligent waiver of a constitutional right generally requires the defendant to "bring[]

forward" facts not contained in the direct appeal record. *People v. Janis*, 2018 CO 89, ¶ 27 (discussing waiver of the right to testify).

¶ 20    But O'Brien insists that we resolve his claim on the current record. Therefore, reviewing only the record on appeal, we consider whether O'Brien validly waived his right to conflict-free counsel and, if he did not, whether he has established that his lawyers had a conflict of interest that adversely affected their performance.

## C.    Validity of the Waiver

¶ 21    O'Brien argues that the trial court's advisement was so deficient that, as a matter of law, he could not have knowingly, intelligently, and voluntarily waived his right to conflict-free counsel.

¶ 22    First, O'Brien says that the court erred by simply accepting defense counsel's assurances that they had fully advised him of the risks of joint representation. We agree that would be error. *See People v. Lopez*, 2024 CO 50, ¶ 48 (counsel's representation that they have advised the defendant of the possible conflict is insufficient to show a valid waiver "without [counsel's] disclos[ure] [of] the specifics of what [they] said and when"). But the court did

8

not simply accept counsel's assurances; it conducted its own colloquy with O'Brien.

¶ 23    O'Brien says the colloquy was insufficient, though, because the trial court did not advise him more specifically of how potential conflicts might affect counsel's representation. But because no specific conflict was apparent, the court properly informed O'Brien of the general risks associated with joint representation. *See United States v. Brown*, 202 F.3d 691, 698 (4th Cir. 2000) ("[I]f a defendant waives the conflict with knowledge of the crux of the conflict and an understanding of its implications, the waiver is valid — even if the defendant does not know each detail concerning the conflict.").

¶ 24    Second, we disagree with O'Brien that the court engaged in "rote" questioning. The court asked detailed questions about the potential impact of the conflict on counsel's representation, repeatedly asked O'Brien if he understood the nature of the conflict, and told O'Brien that he could "talk to independent counsel" or have separate counsel represent him. The "exchange reveal[ed] more than pro forma answers to pro forma questions." *People v. Preciado-Flores*, 66 P.3d 155, 168 (Colo. App. 2002). O'Brien acknowledged that "he was aware of the conflict and its

9

ramifications." *Id.* Nothing in the record indicates that O'Brien did not understand the court's advisement — indeed, O'Brien has never said that his waiver was unknowing or involuntary — or that he "lacked the rational capacity to make a decision of this type." *Id.*

¶ 25    And finally, while a written waiver and consultation with independent counsel might be best practices, O'Brien does not cite any authority for the proposition that they are necessary prerequisites to a valid waiver. Under Colorado law, what matters is that the defendant is made aware of the conflict and its potential impact on counsel's ability to offer effective representation. *See People v. Harlan*, 54 P.3d 871, 879 (Colo. 2002).

¶ 26    In *People v. Waddell*, 24 P.3d 3 (Colo. App. 2000), for example, the defendant apparently neither executed a written waiver nor consulted independent counsel. The court conducted a brief colloquy with the defendant to ensure that he was aware his lawyer was being prosecuted by the same district attorney who was prosecuting the defendant's case. *Id.* at 7-8. The court did not advise the defendant about the potential impact of the conflict on counsel's representation, but it determined that the lawyer had done so and that the defendant nonetheless wished to waive any

conflict.  *Id.* at 8.  Under those circumstances, despite the "abbreviated nature" of the colloquy, the division concluded that the defendant's waiver was valid.  *Id.*

¶ 27     On this record, we conclude that the trial court correctly determined that O'Brien validly waived his right to conflict-free counsel.

### D.     Conflict That Adversely Affected Counsel's Performance

¶ 28     But even if O'Brien's waiver were invalid, his ineffective assistance of counsel claim fails.  He cannot establish that his lawyers passed up an objectively reasonable defense due to the conflict.

¶ 29     On appeal, O'Brien asserts that his "best defense" was that Lunn was more familiar than him with transport protocols and the particular van used, and, therefore, "the failure to ensure that [Shankling] was transported in an appropriate and safe manner . . . fell more on [Lunn's] shoulders."  He says that his lawyers could not

11

pursue that defense, though, as it would have been adverse to Lunn's interests.[2]

¶ 30    The argument is unconvincing for several reasons.

¶ 31    First, defense counsel *did* argue that O'Brien was unfamiliar with transport protocols and the van's design. Counsel elicited testimony from a BCSO detective that O'Brien had spent his career on the "operations" side of the sheriff's office, and, unlike jail staff, operations officers do not receive training concerning "transport vans." Then, during closing argument, to rebut the prosecutor's assertion that Shankling should have been placed, seated, in the small side compartment, defense counsel emphasized O'Brien's lack of training and knowledge of the van. She argued that the van was generally used to take sober inmates to and from the county jail, but on the night Shankling died, it was used for the "completely unintended purpose" of taking intoxicated people to a detox center. Neither Lunn nor O'Brien had "seen the van before," she said, and

---

[2] At oral argument, O'Brien's appellate lawyer argued that the conflict also prevented counsel from moving to sever the cases, seeking a plea deal, or advising O'Brien to testify. We do not address those arguments. *See Rucker v. Fed. Nat'l Mortg. Ass'n,* 2016 COA 114, ¶ 35 (court does not address contentions raised for the first time at oral argument).

neither had been "trained on the use of th[e] van in connection with the transport of intoxicated individuals." The jury was not persuaded.

¶ 32   At oral argument, O'Brien's appellate lawyer suggested that the conflict prevented trial counsel from raising the specific defense that O'Brien, unlike Lunn, was actually unaware of the van's small side compartment. But that defense is unsupported by the evidence. Just after the incident, O'Brien was interviewed by a sheriff's office investigator. He told her that earlier that night, he and Lunn had used the small side compartment to transport a different person to the detox center. He also said that while transporting Shankling, he "got inside that smaller compartment" to check on him. Thus, an argument that O'Brien was unaware of the smaller side compartment was neither plausible nor objectively reasonable under the facts known to counsel. *See West*, ¶ 3; *see also Gaulden v. United States*, 239 A.3d 592, 599 (D.C. 2020) (for purposes of demonstrating that a conflict of interest adversely affected counsel's performance, a defense is not plausible if the evidence at trial would not support it); *Freund v. Butterworth*, 165 F.3d 839, 867 (11th Cir. 1999) (the defendant could not

demonstrate that a conflict of interest adversely affected counsel's performance because the proposed defense of shifting blame to the codefendant was not reasonable under the facts).

¶ 33    At any rate, that O'Brien was not aware of a more appropriate compartment for transporting detainees is not a defense to manslaughter.  A person commits manslaughter if he "recklessly causes the death of another person."  § 18-3-104(1)(a), C.R.S. 2024.  Thus, the prosecution had to prove that O'Brien "consciously disregard[ed] a substantial and unjustifiable risk" that his actions would cause Shankling's death.  § 18-1-501(8), C.R.S. 2024; *Mata-Medina v. People*, 71 P.3d 973, 978 (Colo. 2003).

¶ 34    The criminal conduct was O'Brien's act of wedging Shankling, handcuffed and in a prone position, into the four-foot-nine-inch rear compartment, despite his knowledge that transporting Shankling in this position might cause asphyxia.  Whatever else O'Brien knew about the van was irrelevant.  The issue was not whether O'Brien had sufficient information to make a different or better decision; it was whether the decision he did make demonstrated his conscious disregard of a substantial and unjustifiable risk that Shankling would die by suffocation.

14

¶ 35   For this reason, we presume that defense counsel chose to focus on the defenses that would negate the elements of manslaughter — that the defendants' actions did not cause Shankling's death and, due to inadequate training, they were unaware of the risks associated with Shankling's positioning in the van.  Counsel's choice to forgo a factually and legally nonviable defense in favor of a relevant defense does not establish that counsel's performance was adversely affected by a conflict.  *See McFarland v. Yukins*, 356 F.3d 688, 706-07 (6th Cir. 2004) (Counsel's choice to forgo a defense "is evidence of adverse effect only if it is clear that the choice was not part of a legitimate strategy, judged under [a] deferential review of counsel's performance.").

¶ 36   Finally, we reject O'Brien's contention that his lawyers' conflict of interest prevented them from shifting the blame to Lunn at sentencing.  It is not clear what the lawyers should have said, unless O'Brien's argument is that his relative lack of knowledge of the van constituted mitigating evidence.  But for the same reason his supposed lack of knowledge was not a viable defense, it was also not viable mitigation.  In fact, O'Brien's own attempt to use his

15

unfamiliarity with the van as mitigation was unsuccessful. Despite telling the court during his allocution at sentencing that he "wasn't familiar with the van," he "didn't know" about the other compartments, and he "didn't know that the container [they] put [Shankling] in was too short," the court adopted the presentence investigation report's (PSI) recommendation of a six-year sentence.

¶ 37    The problem for O'Brien at sentencing was not his lawyers' purported inability to point the finger at Lunn concerning the van. His problem was that he appeared more culpable and less remorseful than Lunn. As he concedes in his opening brief, he had more experience and training than Lunn, and he was primarily responsible for monitoring Shankling while Lunn drove the van. And as he acknowledged at sentencing, he, not Lunn, made inappropriate comments and jokes on the night of the offense. According to the PSI writer, O'Brien exhibited little remorse or empathy, instead blaming Shankling and others for his own criminal conduct.

¶ 38    Presumably in light of the irrelevance of the van evidence, defense counsel focused on O'Brien's personal characteristics, telling the court that O'Brien was "filled with remorse and shame"

but had a "hard time . . . expressing it." He presented witnesses to talk about O'Brien's difficult family circumstances and his exemplary record as a deputy.

¶ 39    Under the circumstances, O'Brien cannot establish that his lawyer's decision to forgo shifting the blame to Lunn was linked to the conflict arising from joint representation. *See State v. West*, 2018-Ohio-640, ¶ 32, 106 N.E.3d 96, 106-07 (Ct. App. 2018) (counsel's decision at sentencing not to focus on one defendant's lesser culpability was not "indicative of an actual conflict of interest" where a different strategy was more viable).

### III.    Improper Expert Testimony

¶ 40    As noted, the prosecution had to show that O'Brien consciously disregarded a substantial and unjustifiable risk that his actions would cause Shankling's death. Because the question of whether O'Brien consciously disregarded a risk turned on what a reasonable person with his "knowledge and experience would have been aware of" at the time, *People v. Hall*, 999 P.2d 207, 216 (Colo. 2000), the prosecution introduced evidence that BCSO deputies are trained about the risks of and ways to prevent positional asphyxia.

- BCSO Sergeant Jeff Pelletier testified that "[a]ll the way back to the . . . academy . . . there was training specific to . . . positional asphyxia" and that the "general practice" was to "not keep people on their stomach." In response to a juror question, he explained that his training "contributed to his concern" about the way Shankling was "loaded into the van."

- JoAnna Compton, a BCSO detective, testified that she first learned about positional asphyxia in the police academy and had subsequent training on the subject. She said that BCSO officers "are trained not to" "handcuff somebody and leave them on their stomach . . . for really any period of time."

- BCSO Commander Jason Oehlkers testified that O'Brien attended multiple training sessions, beginning in 2007, that covered positional asphyxia. He told the jury that based on "everything that [he had] been taught," he did not think it was "appropriate" to "leave a handcuffed person on their stomach for over 16 minutes."

- Rex Brown, a former police officer, testified that he trained BCSO deputies on subjects including positional asphyxia. He described the content of a 2007 training program O'Brien

attended that covered positional asphyxia. During his testimony, he defined positional asphyxia as "a [body] position that inhibits your ability to breathe" and explained that "if you get drunk and pass out in a certain position, you can have this happen."

- BCSO Sergeant Judson Vaughan testified that deputies are "consistently" trained about positional asphyxia and specifically instructed that "once someone's on the ground," the deputies should "roll them over, sit them up, monitor their breathing, [and] make sure they're doing okay." He said that a training he conducted in 2018 included a description of risk factors associated with positional asphyxia, including alcohol and drug use.

- BCSO Commander Tim Oliveira described in detail the content of a 2018 training session he conducted on the prevention of in-custody deaths. Trainees were instructed not to leave a person in the prone position because, among other reasons, lying face down could inhibit the person's ability to "get enough oxygen in."

¶ 41    O'Brien argues that the officers, who testified as lay witnesses, improperly offered expert testimony "about positional asphyxia, including proper positioning and transport of handcuffed detainees, as well as risk factors associated with [positional asphyxia], such as drugs and alcohol."[3]

¶ 42    We review the trial court's decision to admit evidence for an abuse of discretion. *See People v. Martinez*, 2020 COA 141, ¶ 61. But because O'Brien's counsel did not object to any of the cited testimony, we reverse only on a finding of plain error. *See id.* at ¶ 62. To constitute plain error, the error must be obvious and must so undermine the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the verdict. *Id.*

¶ 43    A witness's testimony may be classified as lay testimony, lay opinion testimony, or expert testimony. *People v. Murphy*, 2021 CO 22, ¶ 17. Lay testimony is factual in nature, not opinion based. *Id.*

---

[3] Our review of this argument is hindered by O'Brien's failure to specifically identify the challenged testimony and explain why it amounts to expert testimony. It is not this court's function "to make or develop a party's argument when that party has not endeavored to do so itself." *Gravina Siding & Windows Co. v. Gravina*, 2022 COA 50, ¶ 71 (citation omitted).

But if a lay witness meets the requirements of CRE 701, the witness may provide opinion testimony. *Murphy*, ¶ 17.

¶ 44    Whether a witness's testimony constitutes a lay opinion under CRE 701 or an expert opinion under CRE 702 depends on the basis for the witness's opinion. *Venalonzo v. People*, 2017 CO 9, ¶¶ 16-17. If the witness provides testimony that could be expected to be based on an ordinary person's experiences or knowledge, then the witness is offering lay testimony. *Id.* at ¶ 23. But if the witness provides testimony that could not be offered without specialized experiences, knowledge, or training, then the witness is offering expert testimony. *Id.*

¶ 45    For the most part, the six officers merely recounted historical facts — testimony that did not implicate CRE 701 or 702. They described the training provided to BCSO deputies about positional asphyxia to show that O'Brien knew he should not have placed a highly intoxicated handcuffed detainee in a prone position for sixteen minutes. An officer's testimony about training received or conducted is lay testimony because "any ordinary person is capable of describing her own" training or background. *Venalonzo*, ¶ 27 (forensic interviewer's testimony about her training and experience

21

was lay testimony); *see also People v. Stewart*, 55 P.3d 107, 123 (Colo. 2002) (concluding that an officer's testimony conveying his observations of the crime scene was lay testimony and explaining that "police officers regularly, and appropriately, offer testimony under Rule 701 based on their perceptions and experiences"); *see also Murphy*, ¶ 31 (concluding that an officer's testimony about an interviewee's body language was lay opinion testimony and explaining that "simply referencing one's 'training and experience' does not transform an officer's lay opinion testimony into expert testimony").

¶ 46    To the extent some of the officers' testimony crossed the line, not just into opinion testimony but into expert testimony, we conclude that any error was not plain. For one thing, it is difficult on this record to pinpoint when the witnesses may have moved from recounting their training to offering explanations or opinions, and O'Brien does not identify any such point. Accordingly, we cannot say that the trial court should have been able to discern any shift without the benefit of an objection. *See People v. Davis*, 2012 COA 56, ¶ 52 (no plain error in admission of improper testimony because the trial court could not have determined without the benefit of an

objection that the officer's testimony strayed from allowable expert testimony to impermissible summarizing of facts). Moreover, any opinions offered by the officers were cumulative of the prosecution's medical expert's testimony. The medical examiner testified that Shankling died from asphyxia "due to the positioning of the body." She opined that when the officers "wedg[ed]" Shankling's seventy-two-inch body into the fifty-seven-inch compartment, his buttocks and pelvic region lifted off the van floor leading to "unnatural contortion" that compressed his neck either sharply forward or backward such that the arteries and vessels in his neck (and, potentially, his airway) were obstructed. According to the medical examiner, if the "positional event" had not occurred, Shankling would not have died. Thus, any opinions from the officers that placing a handcuffed person on his stomach for several minutes could be harmful would merely amount to similar, but less forceful, testimony. As a result, any error in admitting the testimony was not plain. *See People v. Douglas*, 2015 COA 155, ¶ 41 ("Where the improperly admitted lay testimony is cumulative of properly admitted expert testimony, there is no plain error.").

## IV.   Disposition

The judgment is affirmed.

JUDGE J. JONES and JUDGE GOMEZ concur.