# In the Iowa Supreme Court

No. 23–2016

Submitted September 10, 2025—Filed March 13, 2026

**State of Iowa,**

Appellee,

vs.

**Christopher Joseph Hidlebaugh,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dallas County, Michael K. Jacobsen, judge.

Defendant seeks further review of the court of appeals decision affirming his sentence. **Decision of Court of Appeals Vacated; Sentence Vacated and Case Remanded for Resentencing.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, Mansfield, and McDermott, JJ., joined. May, J., filed a dissenting opinion, in which McDonald and Oxley, JJ., joined.

Martha J. Lucey, State Appellate Defender, Melinda J. Nye (argued), and Ashley Stewart (until withdrawal), Assistant Appellate Defenders, for appellant.

Brenna Bird, Attorney General, Katherine Wenman (argued), and Linda J. Hines (until withdrawal), Assistant Attorneys General, for appellee.

**Christensen, Chief Justice.**

This case involves an unusual plea agreement where the defendant literally "bet the house." At the plea hearing, the parties agreed that they would jointly recommend a suspended sentence with probation if the defendant was able to contract to buy a house before sentencing, but a prison sentence otherwise. The defendant contends that despite his best efforts, he was financially unable to contract to buy a house during the seventy-day period between plea and sentencing. Nevertheless, the district court adhered to the plea agreement and sentenced the defendant to prison. As the district court put it, "If the shoe was on the other foot, would you want the State to follow their plea agreement?"

The defendant now appeals. He argues that he has been incarcerated because he cannot afford to buy a house due to his limited financial resources. We conclude that to the extent the defendant's imprisonment results from his failure to meet a financial obligation despite his good faith efforts to do so, his sentence is unconstitutional, and we vacate his sentence and remand for resentencing.

## I. Background Facts and Proceedings.

Back in 2011, Christopher Hidlebaugh, who reports that he was sexually abused by a family member as a child, pleaded guilty to one charge of indecent contact with a child. The victim of this offense was a thirteen-year-old; Hidlebaugh was approximately nineteen years old at the time. Hidlebaugh was originally granted probation. However, his probation was revoked after he was found in violation of the sex offender registry. In subsequent years, Hidlebaugh's only criminal conviction, outside of additional sex offender registry violations, was a conviction for driving while barred.

In spring 2023, Hidlebaugh was again charged with failure to comply with the sex offender registry, second or subsequent violation, under Iowa Code section 692A.111(1) (2023). After a determination of his indigency, Hidlebaugh qualified for and received appointed counsel. The State later amended the trial information to charge Hidlebaugh as a habitual offender.

On September 29, the parties appeared before the district court for entry of a guilty plea. The State described the parties' plea agreement as follows:

> The parties have discussed a certain sentencing option that depends on the defendant's actions in this matter. The defendant has indicated his desire and his willingness and his efforts to move forward in purchasing a residence in the county. The parties feel that this may help resolve his issues with registry violations, having a permanent address. And based upon the representation by the defendant, he believes that given the opportunity he will have a home by the sentencing date. And the State has agreed that if he has proof of a mortgage or proof of a real estate contract at the time of sentencing, the State will recommend a suspended sentence with probation in this matter.
>
> And it's also understood, and it's my understanding the defendant agrees, that if he has not reached that point in the purchase of a home, of a formal residence, that the State will be recommending prison, and he is in agreement with that recommendation. It's my understanding that he has been told that there is a mandatory minimum of three years with this offense to be served before parole and that he is entering into this agreement voluntarily and with this knowledge.
>
> We have agreed to set forward as the recommended sentencing date of December 8th of this year at 9:00 a.m., which on the calendar appears to be a generous amount of time, and hopefully that Mr. Hidlebaugh will be able to accomplish those goals that he has set out for a permanent residence.

Hidlebaugh's counsel confirmed on the record that this was indeed the parties' plea agreement. The parties also confirmed that if Hidlebaugh received a prison sentence, it would be a fifteen-year sentence with a three-year mandatory minimum. The agreement raised the eyebrows of the colloquy judge, who

highlighted the risk that an agreement to purchase a home might fall through unexpectedly.

During this back-and-forth, Hidlebaugh, through counsel, defended the agreement, claiming that he "came today with his homework done, and he has his plan and his loan meeting and some houses, but nobody, can, you know, predict." One reason for optimism, Hidlebaugh insisted, was that he did not have any restrictions on where he could live. However, Hidlebaugh recognized that "it is sort of a risk" that he might not be able to secure a mortgage or proof of a real estate contract in time for his sentencing hearing. After this back-and-forth, Hidlebaugh affirmed his understanding of the plea agreement, and the colloquy continued in a typical manner. Neither party filed a written plea agreement, so the transcribed statements made during colloquy are the only basis in the record for identifying the terms of the plea agreement.

Hidlebaugh's sentencing hearing was slated to occur seventy days later. During this period, a presentence investigation (PSI) report was prepared. The PSI report described Hidlebaugh as a low risk to reoffend and recommended that the court sentence him to probation.

However, at the December 8 sentencing hearing, it turned out that Hidlebaugh had been unable to contract to buy a house. The State recommended that Hidlebaugh be sentenced to prison. Hidlebaugh's counsel, without elaborating, asked the district court to follow the plea agreement but to hear from her client in allocution.

> The agreement was for me to, in fact, get a deed to a house. I am not financially able to purchase a house right now. I do have a stable place to live. I do have a very well-paying job, one of the top-paying jobs in Perry. So I guess my only thing would be, Your Honor, is I -- like I said, I do understand we did enter a plea agreement, but I would like the Court to consider the fact that . . . [t]he PSI does recommend probation. Fort Des Moines doesn't even want me

because I have a stable place to live. It's not that I don't – [the prosecutor] said that I had -- not a stable place to live, but that's not the truth. I do have a stable place to live. My cousin owns her house, and she has offered me a place to live until I can financially be able to purchase my own.

I have been in works with a Realtor. I have paid off my collections with the help of my grandfather. . . .

. . . [W]e did say that there was risk about taking the plea agreement. I just thought, myself – I didn't know it was going to be so financial -- I guess -- I guess the bank wants me to have 10 percent because my credit is low. Like I said, my credit has -- is rising, and I have been saving money, so it's not like I'm not doing it. It's just -- and I even asked [defense counsel] today if I could possibly get a continuance to give me a little bit more time to save more money so I could buy my own house, and out of respect for [defense counsel], she said that she didn't feel that it was, I guess, appropriate just because we had a plea agreement. But I -- like I said, I understand we have a plea agreement, but I do have a very good-paying job. I go to work every day.

. . . .

. . . I -- I work doubles. I've been working doubles because I knew I was going to need money, so I've been -- I've been trying. I've been -- excuse my language, but I've been busting my ass.

Beyond just working more hours, Hidlebaugh added that he had left Casey's—where he had been earning $13.50 an hour— and was earning $23.50 per hour working for a cleaning contractor for the local Tyson plant. Lastly, Hidlebaugh explained that he was unable to rent due to being on the registry, but he had a stable living arrangement set up with his cousin, who was in court to confirm that.

Following Hidlebaugh's allocution, the court asked, "If the shoe was on the other foot, would you want the State to follow their plea agreement?" Hidlebaugh responded, "I would want the State to see that a person is trying, and that this person is continuously working to try to meet his end of the bargain. It's just I

don't have the financial stability right now to have the down payment for a house."

The district court then pronounced its sentence. It enumerated various factors, concluding as follows:

> The Court has considered Mr. Hidlebaugh's request that the Court not follow the plea agreement in this matter and has considered the presentence investigation. In light of his prior criminal history and in light of the plea agreement, the Court declines to suspend the sentence.

Hidlebaugh appealed the sentence, arguing that the district court considered an improper sentencing factor by penalizing him for not being able to afford a home, and that the sentence violated the Fourteenth Amendment to the U.S. Constitution and article I, section 6 of the Iowa Constitution. We transferred the case to the court of appeals. The court of appeals determined it lacked jurisdiction to hear the appeal, and Hidlebaugh's constitutional argument was not addressed. We granted further review.

**II. Hidlebaugh Has Established Good Cause Under Iowa Code § 814.6(1)(*a*)(3).**

Iowa appellate courts lack jurisdiction to review a sentence pursuant to a plea agreement unless the defendant is being sentenced for a "class 'A' felony" or there is "good cause" to do so. Iowa Code § 814.6(1)(*a*)(3). Because Hidlebaugh was not convicted of a class "A" felony, he must be able to show good cause for our appellate courts to have jurisdiction over the appeal of his sentence. We have held that this provision only restricts "a narrow class of defendants from pursuing a direct appeal as a matter of right: those who plead guilty to non-class A offenses and cannot articulate a legally sufficient reason to pursue a direct appeal." *State v. Tucker*, 959 N.W.2d 140, 149 (Iowa 2021). Hidlebaugh "bears

the burden of establishing good cause to pursue an appeal of [his] conviction based on a guilty plea." *State v. Damme*, 944 N.W.2d 98, 104 (Iowa 2020).

We have defined "good cause" as a "legally sufficient reason." *Id.* (quoting *Good Cause, Black's Law Dictionary* 274 (11th ed. 2019)). A legally sufficient reason is a ground that potentially would afford the appellant relief. *Tucker*, 959 N.W.2d at 149. Hidlebaugh has raised a constitutional challenge to the sentence, claiming that the sentencing court violated equal protection and due process by considering his financial inability to purchase a home in its decision to sentence him to prison. He also contends that the district court abused its sentencing discretion in considering an improper factor at the time of sentencing—whether Hidlebaugh owned or was under contract to own a home at the time of sentencing. If Hidlebaugh were successful in raising these challenges, he would be entitled to resentencing. Hidlebaugh has thus established good cause to appeal as a matter of right. *See State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021) ("[G]ood cause exists to appeal from a conviction following a guilty plea when the defendant challenges his or her sentence rather than the guilty plea." (quoting *State v. Boldon*, 954 N.W.2d 62, 69 (Iowa 2021))).

A defendant challenging his sentence can establish good cause even where the sentence is completely in line with the recommendation contemplated by a plea agreement. *State v. Davis* dealt with a situation where the defendant received a sentence in complete accordance with their plea agreement but alleged that they had been denied a proper opportunity for allocution. 969 N.W.2d 783, 784 (Iowa 2022) ("[T]he district court sentenced Davis to the bargained-for sentence."). There, we said, "Davis's challenge to the sentencing hearing and the subsequent sentence establishes good cause to appeal as a matter of right." *Id.*

However, in *State v. Wilbourn*, "[w]e save[d] for another day the question of whether good cause exists to solely appeal an agreed sentence without an accompanying sentencing error outside the scope of the plea agreement." 974 N.W.2d 58, 66 (Iowa 2022). Therefore, it is necessary to determine where the good-cause bar lies for Hidlebaugh before we can determine whether he successfully satisfied the burden of establishing good cause. Here, Hidlebaugh raises a constitutional error with the sentencing hearing. Such a challenge is outside the scope of the plea agreement itself and thus is a challenge to the sentencing hearing within the meaning of *Davis*. 969 N.W.2d at 784. The outcome might be different if this were an agreement made under Iowa Rule of Criminal Procedure 2.10(3)[1], where the court would be bound to enter a particular sentence pursuant to the plea agreement, but we leave that question for another day.

**III. The District Court Violated Hidlebaugh's Constitutional Rights by Sentencing Him to Prison.**

Hidlebaugh mounts a constitutional challenge to his sentence under the Fourteenth Amendment to the U.S. Constitution and article I, section 6 of the Iowa Constitution.[2] The appropriate standard of review for such a challenge is de novo. *State v. Ragland*, 836 N.W.2d 107, 113 (Iowa 2013).

Iowa law requires courts to consider the full picture of a defendant before imposing a sentence. Under Iowa Code section 901.2(2)(*b*) and section 901.2(4),

---

[1]For plea agreements entered into under Iowa Rule of Criminal Procedure 2.10(3), a sentencing court is required to accept the recommendations contemplated by the plea agreement prior to the parties being bound by its conditions. *See State v. Hightower*, 8 N.W.3d 527, 542 (Iowa 2024) (explaining the mechanics of rule 2.10(3) agreements).

[2]"We usually deem the federal and state equal protection clauses to be identical in scope, import, and purpose." *Lime Lounge, LLC v. City of Des Moines*, 4 N.W.3d 642, 658 (Iowa 2024). Where a party cites to both clauses, but does not advocate a separate interpretation of the state clause, we typically apply the same analysis for both. *Id.*

a PSI must be prepared to provide the court with the information necessary for an informed sentencing decision when the felony is a class "B," "C," or "D" felony. The legislature also specified the categories of information that must be included in the PSI. Relevant here, Iowa Code section 901.3(1)(*a*) requires the report to address the defendant's financial circumstances. Accordingly, evaluating accurate financial information is not optional—it is part of the court's statutory duty during the sentencing process.

A district court's decision to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor and will only be overturned for an abuse of discretion or the consideration of inappropriate matters. *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). However, when considering an indigent defendant's failure to meet a financial commitment as an aggravating factor at sentencing, constitutional considerations demand additional inquiry to prevent sentencing error that would impermissibly deprive a defendant of liberty on the sole basis of their indigency. *Bearden v. Georgia*, 461 U.S. 660, 672–74 (1983).

"There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion). Today, the increasing prominence of plea agreements has, for the most part, converted our criminal justice system to "a system of pleas, not a system of trials." *Missouri v. Frye*, 566 U.S. 134, 143 (2012) (quoting *Lafler v. Cooper*, 566 U.S. 156, 170 (2012)). In this case, we must determine whether Hidlebaugh received equal justice when his prison sentence may have resulted from his financial inability to purchase a home within a seventy-day period.

We begin by construing the terms of the plea agreement that brought about Hidlebaugh's conviction. When construing the terms of a plea agreement,

we look first to the parties' "justified expectations," which includes implicit terms. *See State v. Jordan*, 959 N.W.2d 395, 400 (Iowa 2021) (holding that the terms of the plea agreement included the justified expectation that the defendant appear at the sentencing hearing). The principles of contract interpretation apply to plea agreements. *State v. Beres*, 943 N.W.2d 575, 582 (Iowa 2020) ("Plea bargains are akin to contracts." (quoting *State v. Macke*, 933 N.W.2d 226, 238 (Iowa 2019) (Mansfield, J., concurring in part and dissenting in part))). "The cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) (quoting *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011)). The terms of a plea agreement as described at colloquy control its interpretation, even against inconsistent terms documented in writing. *Macke*, 933 N.W.2d at 236–37.

During the plea colloquy, the prosecutor informed the court that "the State has agreed that if [Hidlebaugh] has proof of a mortgage or proof of a real estate contract at the time of sentencing, the State will recommend a suspended sentence with probation in this matter." Regardless of the precise meaning of these terms, it's clear that Hidlebaugh's plea agreement hinged on his ability to meet a specific financial obligation.

The State interprets the plea agreement on appeal to merely require Hidlebaugh to obtain "stable housing." This interpretation would ask us to look past the plain language the prosecutor used to describe the plea agreement at colloquy that required Hidlebaugh to obtain "proof of a mortgage or proof of a real estate contract at the time of sentencing." Because the prosecutor's statements at colloquy made the terms of the plea agreement unambiguous, and Hidlebaugh relied on those statements in forming his sentencing

recommendation, we reject the State's attempts to rewrite the agreement on appeal to Hidlebaugh's detriment.

A cornerstone case on the protections afforded to indigent defendants is *Bearden v. Georgia*, 461 U.S. 660. In *Bearden*, the defendant, Danny Bearden, was required under his probation agreement to pay $100 on the day of sentencing, $100 the next day, and $550 within four months. *Id.* at 662. He borrowed money from his parents to make the two initial payments but was ultimately unable to make the $550 payment after being laid off from his job. *Id.* Bearden, who had only a ninth-grade education and was unable to read, was unable to secure alternate employment despite his repeated efforts. *Id.* at 662–63. After being unable to make the $550 payment, Bearden's probation was revoked, and he was imprisoned. *Id.* at 663. The Supreme Court of the United States unanimously held that this violated due process and equal protection principles. *Id.* at 672–74.

Equal protection and due process principles require that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." *Id.* at 667–68. The Court continued:

> This distinction, based on the reasons for non-payment, is of critical importance here. If the probationer has willfully refused to pay the fine or restitution when he has the means to pay, the State is perfectly justified in using imprisonment as a sanction to enforce collection. Similarly, a probationer's failure to make sufficient bona fide efforts to seek employment or borrow money in order to pay the fine or restitution may reflect an insufficient concern for paying the debt he owes to society for his crime. In such a situation, the State is likewise justified in revoking probation and using imprisonment as an appropriate penalty for the offense. But if the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are

> available. This lack of fault provides a "substantial reaso[n] which justifie[s] or mitigate[s] the violation and make[s] revocation inappropriate."

*Id.* at 668–69 (alterations in original) (footnote omitted) (citation omitted) (quoting *Gagnon v. Scarpelli,* 411 U.S. 778, 790 (1973)). Hidlebaugh maintains that the district court violated his right to equal protection and due process in imposing a prison sentence because he could not summon the funds to buy a house within the seventy-day period between his plea colloquy and his sentencing hearing. "Due process and equal protection principles converge in the Court's analysis in these cases." *Id.* at 665.

Central to the decision in *Bearden* was the recognition that the criminal justice system should be sensitive to the treatment of indigents and avoid outcomes that punish them solely for lacking financial resources. *Id.* at 664. Courts have employed *Bearden* in numerous contexts, some of which reflect its applicability to Hidlebaugh's sentencing order. *See, e.g., State v. Miller,* 325 P.3d 230, 236 (Wash. Ct. App. 2014) (holding that the defendant could not be punished for making a good faith effort to meet a probation agreement that required him to attend sex-rehabilitation classes at his own expense without considering adequate alternatives to imprisonment); *see also United States v. Burgum,* 633 F.3d 810, 816 (9th Cir. 2011) (invalidating a sentencing order on *Bearden* grounds because it considered the defendant's inability to pay restitution as an aggravating factor).

The State contends we should distinguish *Bearden* because it was in the context of a probation agreement, as opposed to a sentencing pronouncement. We refused to recognize such a distinction in past cases. In *State v. McCalley,* the defendant received a jail sentence for driving while barred as a habitual offender. 972 N.W.2d 672, 675 (Iowa 2022). The defendant claimed the district

court erred by sentencing her to prison because she couldn't pay a fine. *Id.* at 677. We disagreed. *Id.* As we explained, "The district court did not sentence McCalley to a six-day jail term because of her inability to pay a fine. Instead, it sentenced her to a six-day jail term because imposing fines in the past had no impact on McCalley's behavior." *Id.* Yet we acknowledged a limit on the court's sentencing authority. The key was that "McCalley's jail sentence was the result of her conduct, not her financial status." *Id.* at 678. Federal courts have similarly refused to recognize a distinction between revocation of probation and initial sentencing. *See, e.g.*, *Burgum*, 633 F.3d at 814–16 (using the *Bearden* framework to determine that the district court considered an improper factor at sentencing).

Additionally, other state appellate courts have applied equal protection principles to strike down enhanced sentences premised on an indigent's inability to satisfy a financial obligation. *See Noel v. State*, 191 So. 3d 370, 379 (Fla. 2016) (per curiam) ("We view a sentence providing for a reduction of prison time upon the payment of restitution no different than a trial court imposing a lengthier sentence if the defendant fails to make a restitution payment—both being impermissible sentences."); *State v. Henderson*, 304 So. 3d 1026, 1034–35 (La. Ct. App. 2020) (vacating a sentence that imposed a default jail term in the event of default of payment for a fine); *People v. Collins*, 607 N.W.2d 760, 765 (Mich. Ct. App. 1999) (vacating a sentence that allowed a defendant to avoid jail upon payment of restitution). Whether the court is revoking an indigent's probation or ordering imprisonment in the first instance, the result is a defendant going to prison, at least in part, due to his indigent status.

It is true that caselaw applying *Bearden* to initial sentencing decisions is relatively sparing. We believe this is due to the different context. Usually, when a court sentences someone, it is not being asked to consider the individual's

failure to meet a specific financial obligation as a factor in sentencing. Here, though, Hidlebaugh was effectively on "pre-probation" between his guilty plea and his sentencing. To meet his pre-probation, and thus be eligible for a joint recommendation of probation, Hidlebaugh had to come up with the money to make a down payment on a house.

Before incarcerating an indigent criminal defendant solely for being unable to meet a financial obligation, fundamental fairness demands that the court conduct an inquiry to determine whether the defendant's failure to satisfy that obligation was willful. *Bearden*, 461 U.S. at 672. If, after conducting that inquiry, it is determined that the defendant's failure to pay was not willful, the court must consider alternatives to imprisonment before ordering a defendant to serve time in prison for failure to pay. *Id.* In these situations, the court may imprison a defendant "[o]nly if alternate measures are not adequate to meet the State's interests in punishment and deterrence." *Id.*

We have held elsewhere that a "defendant's indigency" may "play no wrongful or improper part in any phase of the sentencing process." *State v. Milliken*, 204 N.W.2d 594, 598 (Iowa 1973); *see also Bearden*, 461 U.S. at 666, n.8 ("[C]onsideration of a defendant's financial background in setting or resetting a sentence [may be] so arbitrary or unfair as to be a denial of due process."). Permitting a court to imprison an indigent, or extend their period of imprisonment, on the basis of their inability to meet certain financial obligations and despite good faith efforts to meet those obligations, would permit a defendant to be imprisoned "solely because he lacked the resources to pay." *Bearden*, 461 U.S. at 667–68.

By analogy, in the child support context, one who fails to pay child support may only be jailed for contempt if their failure to pay was "willful." *See Lamb v.*

*Eads*, 346 N.W.2d 830, 831 (Iowa 1984); *see also id.* at 833 ("On the merits of Donald's due process and equal protection arguments we must distinguish contempt for failure to make the payments during the six years in the past from possible failure to make the current payments ordered by the court. If Donald flouted the dissolution decree in some or all of the six years, he could be held in contempt for that conduct although he might presently be unable to pay support. If Donald was unable to pay during the six years, he had the burden to show the inability. When he failed to make such a showing the district court constitutionally found him in contempt as to past installments. He had counsel in that proceeding, and both his procedural and substantive constitutional rights were observed." (citation omitted)); *Greene v. Dist. Ct.*, 342 N.W.2d 818, 821 (Iowa 1983) (en banc).

Whether or not nonpayment is willful "is of critical importance" in determining whether it may be used as a basis for incarceration. *Bearden*, 461 U.S. at 668. The burden lies on the defendant to make an initial showing that they made good faith efforts to comply with the financial obligation and were unable to do so, at which point the burden shifts to the prosecution to demonstrate the contrary. If a court determines a defendant's failure to pay was willful, the defendant's failure to satisfy a financial obligation may be considered as an aggravating factor at sentencing. In imposing a sentence, a sentencing court may consider any failure to meet a financial obligation that was within the defendant's control and any failure to make best efforts to meet that obligation.

A defendant's agreement to the terms of the plea does not preclude him from challenging the district court's consideration of his inability to meet those terms in determining his sentence. The defendant in *Bearden* likewise agreed to

his probation agreement, yet the Supreme Court concluded that enforcement of the agreement violated equal protection and due process. *Id.* at 672–74.

We now return to the specifics of Hidlebaugh's sentencing. Prior to pronouncing sentence, the district court zeroed in on the plea agreement, asking Hidlebaugh, "If the shoe was on the other foot, would you want the State to follow their plea agreement?" Then, while pronouncing Hidlebaugh's sentence, the district court indicated that it "must also consider the plea agreement that [Hidlebaugh] entered into." Ultimately, it said that it was sending Hidlebaugh to prison because of his criminal history and the plea agreement. Thus, it is clear that *one* of the two factors that led to Hidlebaugh's prison sentence was his financial inability to contract to buy a home during the seventy-day period between plea and sentencing. This was the case even though Hidlebaugh made a prima facie showing that he had used best efforts to buy a home, including quitting his job, taking on a new and better-paying job, and working extra hours—all to no avail.

Such a sentence, in our view, violates the equal protection and due process principles discussed in *Bearden* and its progeny. The fact that the court said it was relying on at least one other factor does not change the analysis. Hidlebaugh is entitled to be sentenced without consideration of an improper factor. *McCalley*, 972 N.W.2d at 677; *Burgum*, 633 F.3d at 816. We cannot be certain which factor "tipped the scales to imprisonment." *State v. Messer*, 306 N.W.2d 731, 733 (Iowa 1981). Therefore, resentencing is necessary to cure the sentence of its constitutional defect. *See id.*

At resentencing, the district court may consider all relevant factors, but it may not consider the plea agreement's joint recommendation for prison based

on Hidlebaugh's failure to buy a house unless it makes a finding that Hidlebaugh did not use best efforts to obtain a house purchase contract.

Finally, we emphasize what we are not addressing in this case. This case does not involve the imposition of restitution or fine, nor does it involve a defendant's failure to pay victim restitution. We are simply holding that when the State and the defendant agree to recommend probation if the defendant meets a financial obligation by the time of sentencing, or prison if he doesn't, the district court may not use that agreement to send the defendant to prison if the defendant demonstrates that, despite his best efforts, he could not meet that financial obligation.[3]

**IV. Conclusion.**

For the reasons stated, the defendant's sentence is vacated, and this case is remanded to the district court for resentencing.

**Decision of Court of Appeals Vacated; Sentence Vacated and Case Remanded for Resentencing.**

Waterman, Mansfield, and McDermott, JJ., join this opinion. May, J., files a dissenting opinion, in which McDonald and Oxley, JJ., join.

---

[3]The dissent criticizes a decision we have not made. This case involves an unusual plea agreement where the recommended path was probation if the defendant met a presentencing financial obligation that wasn't attributable to the offense he had committed—or prison if he didn't. In other words, the parties intended the financial obligation to be the determining factor. And the record indicates that the district court may have viewed it that way as it exercised its sentencing discretion. In this situation, given the defendant's further showing that he made a good faith effort to meet that financial obligation but was unable to do so, we hold that the district court may not sentence the defendant to prison based on the plea agreement absent some finding that the defendant didn't use his best efforts. The dissent misses the mark by conflating a sentencing court's discretion to imprison a defendant based on their overall life circumstances with the lower court's decision to consider Hidlebaugh's failure to meet a specific presentencing financial obligation that wasn't created by his own criminal conduct as the basis for his incarceration.

**May, Justice (dissenting).**

Although I appreciate the majority's efforts on this case, I don't believe that Hidlebaugh's prison sentence should be vacated. Because Hidlebaugh was convicted of felony failure to register as a sex offender (second or subsequent offense) as a habitual offender, the district court was statutorily authorized to sentence him to prison, although probation was also an option. *See* Iowa Code §§ 692A.103–.104 (2023), .111; *id.* § 902.8. Because Hidlebaugh's prison sentence was authorized by statute, that sentence is "cloaked with a strong presumption in [its] favor" and must be affirmed unless the defendant demonstrates that there was an "abuse of discretion" or "defect in the sentencing procedure." *State v. McCalley*, 972 N.W.2d 672, 676 (Iowa 2022) (first quoting *State v. Fetner*, 959 N.W.2d 129, 133 (Iowa 2021); and then quoting *State v. Damme*, 944 N.W.2d 98, 103 (Iowa 2020)). Neither of those errors occurred here. So we must affirm.

The majority claims that Hidlebaugh's sentencing procedure was defective for two interrelated reasons: (1) Hidlebaugh was imprisoned for being too poor to buy a home, a violation of *Bearden v. Georgia*, 461 U.S. 660 (1983); and (2) indeed, the sentencing court was forbidden to consider whether Hidlebaugh succeeded in his efforts to purchase a home prior to sentencing. Those house-purchasing efforts were important because—through the plea agreement—the parties had agreed that their joint sentencing recommendation would depend on the results of those efforts. If Hidlebaugh succeeded, the parties would recommend probation; if he failed, they would recommend prison. Importantly, though, the plea agreement did not bind the district court in any way. No matter what the parties recommended, the court remained free to make

its own independent determination as to what sentence was best in light of all of the relevant circumstances.

This freedom—this discretion—that the court exercised at sentencing is, indeed, a key reason why the majority's claims are wrong. To begin with, *Bearden* wasn't violated here because—unlike in *Bearden*—Hidlebaugh wasn't *automatically* imprisoned *solely* because of his inability to pay financial obligations. Nor was he automatically imprisoned solely because he failed to purchase a home prior to sentencing. Instead, the sentencing court chose Hidlebaugh's sentence as an exercise of judicial discretion. And the court made that choice only after considering a wide range of proper sentencing factors, including Hidlebaugh's extensive criminal background, which includes multiple prior felony convictions, multiple failures on probation, and multiple prior prison terms. This was all proper under *Bearden*.

The majority's fallback position is also wrong. The majority suggests that because Hidlebaugh's failure to purchase a home amounted to a failure to meet a financial obligation, it was an improper sentencing factor, meaning that the sentencing court could not consider it—or, at least, the court could not consider it without making a sua sponte determination that Hidlebaugh's failure was "willful." That is not correct. Every day, Iowa's sentencing judges consider defendants' financial circumstances—both their successes and their failures—together with a host of other factors, all with the goal of choosing a sentence that will best promote rehabilitation and protect the community. That is what Iowa law requires them to do. It is also what Justice O'Connor (a former state court judge) prescribed in her *Bearden* majority opinion. *Bearden* explicitly said that "a sentencing court **can consider** a defendant's . . . financial resources" as part of its consideration of the "the wide range of factors underlying

the exercise of [the] sentencing function." *Bearden*, 461 U.S. at 670 (emphasis added) (quoting *Williams v. Illinois*, 399 U.S. 235, 243 (1970)). And neither *Bearden* nor Iowa law requires the sentencing judge to make any "willfulness" determination as part of that consideration.

Hidlebaugh received a legal sentence through a legal sentencing process. We should affirm.

**I. There Was No *Bearden* Violation.**

**A. What *Bearden* Said.** Danny Bearden pleaded guilty to burglary and theft in Georgia state court. *Bearden*, 461 U.S. at 662. At sentencing, Bearden received probation with various conditions, including deadlines to pay fines and restitution. *Id.* But he did not make all of the payments on time. *Id.* So the state filed a petition to revoke Bearden's "probation because he had not paid the balance." *Id.* at 663. The trial court then "revoked probation for failure to pay the balance of the fine and restitution" and sent Bearden to prison. *Id.* A state appellate court rejected Bearden's claim "that imprisoning him for inability to pay the fine" violated the Fourteenth Amendment to the U.S. Constitution. *Id.*

The Supreme Court granted certiorari to consider whether "the Fourteenth Amendment prohibits a State from revoking an indigent defendant's probation for failure to pay a fine and restitution." *Id.* at 661. The answer is that it depends. On one hand, the Court made it clear that probation may not be revoked "solely" because of a probationer's inability to pay a fine or restitution. *Id.* On the other hand, the Court explained, probation *can* be revoked for failure to pay a fine or restitution *if* the failure involves fault by the probationer, such as "failure to make sufficient bona fide efforts to seek employment or borrow money in order to pay the fine or restitution." *Id.* at 668.

In *Bearden*, the probationer had been revoked *solely* based on his failure to timely pay the fine and restitution. *Id.* at 674. The revocation court had considered no other factors. *Id.* In particular, the court had made no findings as to the reasons for Bearden's failure to pay or whether alternative punishments would be appropriate. *Id.* So the Court reversed and remanded Bearden's case for further proceedings. *Id.*

The Court also made it clear, though, that its opinion did not preclude sentencing courts from considering a defendant's "financial resources" as part of the wide range of factors relevant to sentencing. *Id.* at 670. Here is the key language:

> The State, of course, has a fundamental interest in appropriately punishing persons—rich and poor—who violate its criminal laws. A defendant's poverty in no way immunizes him from punishment. **Thus, when determining initially whether the State's penological interests require imposition of a term of imprisonment, the sentencing court can consider the entire background of the defendant, including his employment history and financial resources.** As we said in *Williams v. Illinois*, "[a]fter having taken into consideration the wide range of factors underlying the exercise of his sentencing function, nothing we now hold precludes a judge from imposing on an indigent, as on any defendant, the maximum penalty prescribed by law."

*Id.* at 669–70 (alteration in original) (emphasis added) (citation omitted) (quoting *Williams*, 399 U.S. at 243). Thus, as we recently noted in *State v. McCalley*, nothing in *Bearden* " 'precludes a judge from imposing on an indigent, as on any defendant, the maximum penalty prescribed by law' if the judge has considered 'the wide range of factors underlying the exercise of [their] sentencing function.' " 972 N.W.2d at 679 (alteration in original) (quoting *Bearden*, 461 U.S. at 670).

**B. *Bearden* Wasn't Offended Here.** Applying these principles here, it is clear that *Bearden* does not require vacation of Hidlebaugh's sentence.[4]

To be sure, *if* an Iowa statute—or maybe even a plea agreement—required *automatic* imprisonment based **solely** on the fact that a defendant had failed to meet a financial goal, such as buying a house, then *Bearden* might well be offended. Indeed, the *Bearden* Court used the word "solely" on at least seven separate occasions, all to emphasize that states may not automatically imprison "solely"—exclusively—because of financial shortcomings. *Bearden*, 461 U.S. at 664 (noting the prohibition on extending a defendant's prison sentence "**solely** because they are too poor to pay the fine" (emphasis added)); *id.* (noting that "a State cannot convert a fine imposed under a fine-only statute into a jail term **solely** because the defendant is indigent and cannot immediately pay the fine in full" (emphasis added)); *id.* at 667 (noting that a state "may not then subject a certain class of convicted defendants to a period of imprisonment beyond the

---

[4]I'm placing aside some other grounds on which *Bearden* might be distinguished, such as the fact that *Bearden* involved a probation revocation rather than an initial sentencing. *Carson v. Commonwealth*, No. 2011-CA-000649-MR, 2012 WL 4839020, at *4 (Ky. Ct. App. Oct. 12, 2012) (noting that *Bearden* involved a postsentencing "revocation of probation" rather than a defendant's presentencing "failure to satisfy the terms of a conditional plea agreement"); *see, e.g.*, *State v. Cross*, 670 P.2d 901, 903 (Idaho 1983) (holding, in direct appeal from sentencing, that "*Bearden* does not apply to this case because the trial court has not revoked probation"); *State v. Wesley*, No. 68,973, 1993 WL 13965720, at *2 (Kan. Ct. App. Oct. 15, 1993) (per curiam) ("*Bearden* and *Duke* are inapplicable to the instant case. Both *Bearden* and *Duke* clearly apply to probation revocation hearings. . . . On their faces, neither *Bearden* nor *Duke* applies to motions to modify sentence."); *McClinton v. State*, 799 So. 2d 123, 127 (Miss. Ct. App. 2001) ("McClinton's claims concern the sentencing court and the terms of his probation. The *Bearden* case concerns the procedures to be followed at a probation revocation hearing, not at the original sentencing."); *State v. West*, 106 N.E.3d 96, 108 (Ohio 2018) ("Unlike the defendant in *Bearden*, West was not a probationer being sentenced to a prison term for his failure to pay previously ordered restitution. Rather, West was a defendant facing sentencing for the first time after entering a guilty plea to two second-degree felonies."). I'm also placing aside the fact that while Bearden's incarceration was based on failures to satisfy state-imposed obligations to pay the state (fines) or victims (restitution), the only financial issue here is Hidlebaugh's voluntarily created plan to buy a house *for himself*. *Cf. State v. Nordahl*, 680 N.W.2d 247, 251 (N.D. 2004) (distinguishing *Bearden*, in which "restitution was imposed by the court as a part of Bearden's sentence," from the situation of a defendant who had "agreed to the restitution amount and agreed to the due date in a plea agreement").

statutory maximum **solely** by reason of their indigency" (emphasis added) (quoting *Williams*, 399 U.S. at 242)); *id.* (noting that the state cannot "impos[e] a fine as a sentence and then automatically conver[t] it into a jail term **solely** because the defendant is indigent and cannot forthwith pay the fine in full" (alterations in original) (emphasis added) (quoting *Tate v. Short*, 401 U.S. 395, 398 (1971))); *id.* at 667–68 (noting that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person **solely** because he lacked the resources to pay it" (emphasis added)); *id.* at 671 (noting that "the State cannot justify incarcerating a probationer who has demonstrated sufficient bona fide efforts to repay his debt to society, **solely** by lumping him together with other poor persons and thereby classifying him as dangerous" (emphasis added)); *id.* at 674 (noting that a state may not "imprison[] a person **solely** because he lacks funds to pay the fine" (emphasis added)).

Thus, as Judge Greer correctly noted, *Bearden* teaches us that although "a defendant's indigency (or inability to find stable housing) in no way immunizes him from punishment, incarcerating a defendant based **solely** on his inability to follow through with a financial undertaking is unconstitutional." *State v. Hidlebaugh*, No. 23–2016, 2025 WL 271367, at *2 (Iowa Ct. App. Jan. 23, 2025) (Greer, Presiding Judge, specially concurring) (emphasis added).

But that is not Hidlebaugh's fact pattern. Iowa law gave the district court discretion to order either prison or probation for Hidlebaugh. And nothing in the plea agreement *required* the district court to imprison Hidlebaugh for any reason, financial or otherwise. Rather, the plea agreement only bound *the parties* in their *recommendations* to the court. Meanwhile, the court remained wholly free to agree or disagree with the parties' recommendations. The court retained its

traditional discretion to choose probation or prison based on the court's independent evaluation of all relevant circumstances and, ultimately, the court's independent judgment as to what sentence would best advance Iowa's penological goals: "maximum opportunity for the rehabilitation of the defendant" and "protection of the community from further offenses by the defendant and others." Iowa Code § 901.5.

And that is what the court did. Consistent with its duties under Iowa law, the district court considered a wide range of factors when determining a proper sentence for Hidlebaugh. The court considered Hidlebaugh's "age," his "employment circumstances," the "presentence investigation," the "plea agreement," Hidlebaugh's "family circumstances," the "nature of" Hidlebaugh's offense, and "the steps" that Hidlebaugh had "taken." Iowa Code §§ 901.2(1), .3, .4B–.5; *id.* § 907.5; Iowa R. Crim. P. 2.23(2)(*f*). The court also considered Hidlebaugh's "prior criminal record," which included all the following:

- A 2011 conviction for indecent contact with a child.
- A 2012 probation revocation that sent Hidlebaugh to prison.
- A 2012 conviction and prison sentence for failing to register as a sex offender.
- A 2015 felony conviction for failing to register as a sex offender (second or subsequent).
- A 2016 probation revocation that again sent him to prison.
- In 2017, another felony conviction, this time for failing to register as a sex offender (second or subsequent), and this time with a prison sentence.
- In 2020, a third felony conviction, again for failing to register as a sex offender (second or subsequent).

- A 2021 conviction for driving while barred.[5]

The court also noted its obligation to consider what sentence would protect the community while providing maximum opportunity for rehabilitation. Ultimately, the court concluded that these goals would best be advanced through a prison sentence.

And so Hidlebaugh's sentencing was exactly what *Bearden* calls for. Hidlebaugh was not imprisoned automatically or "solely" because of any one thing, much less a financial thing. Instead, his sentence was the product of a discretionary choice informed by the court's consideration of a "wide range of factors," just as *Bearden* prescribed. *Bearden*, 461 U.S. at 670. *Bearden* supports affirming Hidlebaugh's sentence, not vacating it.

## II. The Court Didn't Consider an Improper Sentencing Factor.

The majority also suggests that because Hidlebaugh's failure to purchase a home amounts to a failure by Hidlebaugh to meet a financial obligation, it was improper for the district court to consider the home issue—or, at least, the court could not consider that issue without making a sua sponte determination as to whether Hidlebaugh's failure was "willful" or not.

I disagree for three reasons. First, as explained, *Bearden* approves the sentencing court's consideration of a defendant's "financial circumstances" as part of the "wide range of factors" relevant to the sentencing process. 461 U.S. at 670. And nothing in *Bearden* requires the sentencing judge to make a "willfulness" determination as part of that consideration.

Second, Iowa law plainly contemplates that sentencing courts will consider defendants' financial resources—including whether or not they have stable

---

[5]This history is derived from the PSI report, to which no objection was raised.

housing—when deciding between prison and probation. For instance, Iowa Code section 907.5(1)(*c*) requires courts to consider the "defendant's employment circumstances," a central determiner of financial strength and, many times, stability of housing. Similarly, section 907.5(1)(*d*) requires courts to consider the "defendant's family circumstances," which can also impact financial strength as well as housing stability. And, of course, nothing in Iowa law requires the sentencing judge to make a "willfulness" determination before considering these statutorily required factors.

Remember also that the sentencing court is generally permitted to consider any content within the presentence investigation (PSI) report when, as here, the defendant raises no challenge to its content. *See* Iowa Code § 901.5; Iowa R. Crim. P. 2.23(2)(*f*)(4); *State v. Grandberry*, 619 N.W.2d 399, 402 (Iowa 2000) (en banc). And Iowa Code section 901.3(1)(*a*) requires the presentence investigator to inquire into the defendant's "financial circumstances, needs, and potentialities." In Hidlebaugh's case, the PSI report included a thorough inquiry into Hidlebaugh's finances, including his "debts," his "assets," his "means of support," his wages, his timeliness in paying bills, his gambling habits (Hidlebaugh does not partake), and so on. The report also provided a history of Hidlebaugh's living arrangements, including his current address, his cohabitants, and the fact that "he is currently looking to buy a house." Inclusion of these details was wholly proper, of course, because a defendant's housing situation can "directly reflect" on the defendant's chances of rehabilitation and likelihood of committing additional offenses against the community. *State v. Jasper*, No. 01–1286, 2002 WL 1430746, at *1 (Iowa Ct. App. July 3, 2002) ("Jasper's lack of a job, housing, or a current support network directly reflects on his chances for reform or rehabilitation, and also reflects on the court's duty

to protect the public from further criminal activity."); *see also State v. Olmstead*, No. 21–1053, 2022 WL 2824738, at *1 (Iowa Ct. App. July 20, 2022) (approving the district court's reasoning, which included its observation that the defendant's " 'lack of a stable residence' did not 'reflect favorably on [his] ability to comply with the terms and conditions of probation' "); *State v. Hernandez*, No. 20–0385, 2021 WL 1400070, at *1 (Iowa Ct. App. Apr. 14, 2021) (noting that the defendant's "unstable housing situation" was an "appropriate consideration" at sentencing).

Finally, just thinking from a practical perspective, I don't think the court could have completed the sentencing without considering the plea agreement as well as Hidlebaugh's success or failure in meeting the agreement's housing goal and the parties' joint sentencing recommendation. Obviously, the court was required to let the prosecutor and the defense lawyer speak. Iowa Code § 901.4B; Iowa R. Crim. P. 2.23(2)(*d*). And under Iowa Rule of Criminal Procedure 2.23(2)(*f*), the court was required to "consider" the sentencing "recommendation of the prosecuting attorney, subject to the terms of the plea agreement" as well as the "recommendation of the defendant's attorney, subject to the terms of the plea agreement." Iowa R. Crim. P. 2.23(2)(*f*)(1)–(2). It follows that the court was required to consider the prosecutor's statements that (1) through the plea agreement, the parties agreed that their joint sentencing recommendation would depend upon whether or not Hidlebaugh purchased a house[6] by the time of the sentencing hearing; (2) as things turned out, Hidlebaugh had not met the plea agreement's housing goal; and (3) as a result, the parties were jointly

---

[6]I recognize there were differences between what was said at the plea hearing—that Hidlebaugh had to obtain a mortgage or contract for sale—and what the prosecutor said about housing stability at the sentencing hearing. But neither defense counsel nor the defendant complained that the prosecutor had misstated the deal. And there's no claim that the court was confused about what the deal required.

recommending prison. Likewise, the court was required to consider defense counsel's silent agreement with the prosecutor's explanation of the situation, as well as defense counsel's audible request that the court "follow the plea agreement."

In short, the sentencing court was *required* to consider the plea agreement as well as Hidlebaugh's failure or success in reaching the agreement's housing goal and, perhaps most importantly, the joint sentencing recommendation that the agreement required. The court was required to consider those things *no matter* whether Hidlebaugh's failure to reach the housing goal was "willful" or not. Indeed, if the court had *refused* to consider those things—because of Hidlebaugh's lack of willfulness or for any other reason—*that refusal* would have violated rule 2.23(2)(*f*) and constituted reversible error. Therefore, the majority certainly has it wrong—indeed, 180 degrees wrong—to hold that the sentencing court erred by considering the plea agreement, Hidlebaugh's performance under that agreement, or the resulting joint sentencing recommendation.

### III. What Will Happen on Remand?

I wonder about the practical implications of today's decision for Hidlebaugh's case on remand (and maybe for other cases, too, although the majority downplays that concern). Here are some of my questions and concerns:

- Under the majority's new burden-shifting procedure, Hidlebaugh has the burden of making "an initial showing" that he "made good faith efforts to comply with the financial obligation and [was] unable to do so." According to the majority, though, Hidlebaugh has already "made a prima facie showing" that he was unable to purchase a house despite his "best efforts." I think this refers to the "showing" that Hidlebaugh made during his

allocution at his prior sentencing, from which he now appeals. So, on remand, does Hidlebaugh need to make his "showing" again, or not?

- Assuming he does, should his opportunity to make that showing come through a second allocution or through standard testimony?

- Either way, if Hidlebaugh's in-court statements are going to be used to carry a burden, should Hidlebaugh be placed under oath? *Cf.* Celine Chan, Note, *A Defendant's Word on Its Face or Under Oath?*, 75 Brook. L. Rev. 579, 581–82 (2009) (arguing that allocutions should be conducted under oath and subject to cross-examination).

- Also, should the State have the opportunity to cross-examine Hidlebaugh? *See id.* That would make sense if—as the majority explains—the burden may ultimately shift to the State "to demonstrate the contrary," that is, to demonstrate that Hidlebaugh did not make sufficient efforts.

- What other options will the State have as it tries to carry that burden? If the State distrusts Hidlebaugh's representations, should the State have some further opportunity to investigate them? And may the State present its own witnesses and other evidence as well?

- In any event, the majority says that if the State is ultimately unable to prove that Hidlebaugh did not "use best efforts to obtain a house purchase contract," then the district court may not consider the parties' joint sentencing recommendation when it sentences Hidlebaugh. This raises several concerns. First off, how can we reconcile that sort of prohibition with Iowa Code section 901.4B, which gives both "the prosecuting attorney" and "the defendant's attorney" the right "to speak" before the court "impos[es] sentence"? If the sentencing court can't consider the

attorneys' sentencing recommendation(s), what little point is served by allowing attorneys "to speak" at the sentencing?

- Moreover, as already explained, a sentencing court's refusal to consider the parties' joint sentencing recommendation would violate rule 2.23(2), which expressly requires the court to "consider" the sentencing "recommendation of the prosecuting attorney, subject to the terms of the plea agreement" as well as the "recommendation of the defendant's attorney, subject to the terms of the plea agreement." Iowa R. Crim. P. 2.23(2)(*f*)(1)–(2). How can the majority avoid these requirements without finding that rule 2.23(2) is unconstitutional, at least as applied to Hidlebaugh?

- And even placing aside section 901.4B and rule 2.23(2), I still can't imagine a sentencing hearing where a judge makes a discretionary sentencing choice—prison versus probation—without the benefit of recommendations of counsel. As a practical matter, then, the remand court may feel some pressure to allow new and different sentencing recommendations that weren't contemplated by the parties' plea agreement. *Cf. United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010) ("A court therefore must proceed by giving the parties 'an opportunity to argue for whatever sentence they deem appropriate.' " (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007))). But wouldn't that run contrary to our traditional refusal to rewrite plea agreements? As Justice Waterman recently noted, "We should not allow a defendant 'to transform what was a favorable plea bargain in the district court to an even better deal on appeal,' " or, in this case, on remand. *State v. Pagliai*, 30 N.W.3d 226, 237 (Iowa 2026) (Waterman, J., dissenting) (quoting

*State v. Ceretti*, 871 N.W.2d 88, 97 (Iowa 2015)). Otherwise, "defendants might be motivated to enter plea agreements quietly—even if they" have concerns about the agreements' terms—"and then appeal them to obtain a more lenient sentence." *Ceretti*, 871 N.W.2d at 97. I do not accuse Hidlebaugh of that sort of guilefulness. But it is hard to know either way.

**IV. Conclusion.**

For all of these reasons, I think we must affirm the sentence already imposed. At the same time, I do understand why this case raises questions. It's tempting to wonder about whether Hidlebaugh could have gotten a better plea deal. And although we presume counsel performed competently, it's also tempting to wonder if Hidlebaugh's attorney should have steered him on a different path. On the other hand, considering Hidlebaugh's extensive criminal history—his repeated felony convictions, his repeated failures on probation, his repeated trips to prison—maybe he got the best deal available. Maybe this plea agreement was the only way that he'd even have *a chance* to get the State to recommend probation.

But those questions aren't before us. Hidlebaugh doesn't challenge his plea deal. Nor does he claim that his counsel was ineffective (nor could he raise that claim in this direct appeal, *see* Iowa Code § 814.7). Instead, the only question here is whether Hidlebaugh's sentencing was marred by an "abuse of discretion" or "defect in the sentencing procedure." *McCalley*, 972 N.W.2d at 676 (quoting *Damme*, 944 N.W.2d at 103). Because it was not, we should affirm his sentence. I respectfully dissent.

McDonald and Oxley, JJ., join this dissent.